ORIGINAL

FILED

APR 1 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

1   Kurt M. Kjelland (Bar No. 172076)
    (kurt.kjelland@hellerehrman.com)
2   HELLER EHRMAN LLP
    4350 La Jolla Village Drive
3   San Diego, California  92122-1246
    Telephone (858) 450-8400
4   Facsimile: (858) 450-8499

5

6   *Attorneys for Plaintiffs Seagate Technology LLC,*
    *Seagate Technology International, Seagate Singapore*
7   *International Headquarters Pte. Ltd., and Maxtor Corporation*

8                  UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
9

HRL

CV 08 1950

10  SEAGATE TECHNOLOGY LLC, a
    Delaware limited liability company;          Case No.
11  SEAGATE TECHNOLOGY
    INTERNATIONAL, a Cayman Islands             **COMPLAINT FOR PATENT**
12  company; SEAGATE SINGAPORE                  **INFRINGEMENT**
    INTERNATIONAL HEADQUARTERS                  **(DEMAND FOR JURY TRIAL)**
13  PTE. LTD., a Singapore corporation; and
14  MAXTOR CORPORATION, a Delaware
15  corporation,

16                                 Plaintiffs,

17         v.

18  STEC, Inc., a California corporation.

19                                 Defendant.

20

21       Plaintiffs Seagate Technology LLC, Seagate Technology International, Seagate

22  Singapore International Headquarters Pte. Ltd. (collectively, "the Seagate Plaintiffs"), and

23  Maxtor Corporation ("Maxtor") (collectively, "Plaintiffs") hereby complain against STEC,

24  Inc. ("STEC") for patent infringement, as follows:

25                                 **PARTIES**

26       1.    Plaintiff Seagate Technology LLC is a limited liability company organized and

27  existing under the laws of the state of Delaware, with its principal place of business in Scotts

28

Heller
Ehrman LLP

Valley, California.

2.    Plaintiff Seagate Technology International is a company organized and existing under the laws of the Cayman Islands, with its principal place of business in the Cayman Islands.

3.    Plaintiff Seagate Singapore International Headquarters Pte. Ltd. is a corporation organized and existing under the laws of Singapore, with its principal place of business in Singapore.

4.    Plaintiff Maxtor is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Scotts Valley, California.

5.    On information and belief, defendant STEC, Inc. ("STEC") is an active corporation organized and existing under the laws of the state of California, with its principal place of business in Santa Ana, California.

## JURISDICTION AND VENUE

6.    This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271 et seq.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.    Defendant STEC is subject to this Court's personal jurisdiction, and venue is proper in this District, because, on information and belief, STEC  (a) is incorporated in and has its principal place of business in California; (b) does substantial business in this District; (c) has an established sales office in this District; (d) sells and offers for sale infringing products in this District; and (e) regularly solicits business from, does business with, and derives revenue from goods and services provided to, customers in this District.

## INTRADISTRICT ASSIGNMENT

8.    Pursuant to Civil Local Rule 3-2(c), this action is to be assigned on a District-wide basis, and Plaintiffs therefore have not listed a Division in this Complaint.

## GENERAL ALLEGATIONS

9.    The Seagate Plaintiffs are the sole holders of the entire right, title, and interest in United States Patent No. 6,404,647 (the "'647 Patent"), entitled "SOLID-STATE MASS

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT
(DEMAND FOR JURY TRIAL)

MEMORY STORAGE DEVICE," issued on June 11, 2002. A true and correct copy of the '647 Patent is attached hereto as Exhibit A.

10.    The Seagate Plaintiffs are the sole holders of the entire right, title, and interest in United States Patent No. 6,849,480 (the "'480 Patent"), entitled "SURFACE MOUNT IC STACKING METHOD AND DEVICE," issued on February 1, 2005. A true and correct copy of the '480 Patent is attached hereto as Exhibit B.

11.    Plaintiff Maxtor is the sole holder of the entire right, title, and interest in United States Patent No. 6,336,174 (the "'174 Patent"), entitled "HARDWARE ASSISTED MEMORY BACKUP SYSTEM AND METHOD," issued on January 1, 2002. A true and correct copy of the '174 Patent is attached hereto as Exhibit C.

12.    The Seagate Plaintiffs are the sole holders of the entire right, title, and interest in United States Patent No. 7,042,664 (the "'664 Patent"), entitled "METHOD AND SYSTEM FOR HOST PROGRAMMABLE DATA STORAGE DEVICE SELF-TESTING," issued on May 9, 2006. A true and correct copy of the '664 Patent is attached hereto as Exhibit D.

## FIRST CLAIM
## INFRINGEMENT OF THE '647 PATENT
### (35 U.S.C. §§ 271 ET SEQ.)

13.    Plaintiffs refer to and incorporate paragraphs 1 through 12 inclusive, as though fully set forth herein.

14.    Plaintiffs are informed and believe and thereon allege that STEC has been and is now infringing the '647 Patent, directly and/or indirectly, by making, using, selling and/or offering for sale in and/or importing into the United States without authority products, including, without limitation, STEC's Zeus and Zeus$^{IOPS}$ Solid State Drive products, STEC's MACH8 Solid State Drive products, and STEC's IDE Flash Drive 2.5" (FLD) products. On information and belief, STEC's infringement as described in this paragraph is continuing.

15.    On information and belief, STEC's infringement as described in Paragraph 14 has been and is willful.

16.    By reason of STEC's acts alleged herein, Plaintiffs have suffered damage in an

1    amount to be proved at trial.

2        17.    On information and belief, STEC's continuing infringement as described in

3    Paragraph 14 has caused and will continue to cause Plaintiffs irreparable harm unless

4    enjoined by this Court. Plaintiffs have no adequate remedy at law.

5                            **SECOND CLAIM**
                **INFRINGEMENT OF THE '480 PATENT**
6                    **(35 U.S.C. §§ 271 ET SEQ.)**

7        18.    Plaintiffs refer to and incorporate paragraphs 1 through 17 inclusive, as though

8    fully set forth herein.

9        19.    Plaintiffs are informed and believe and thereon allege that STEC has been and

10   is now infringing the '480 Patent, directly and/or indirectly, by making, using, selling and/or

11   offering for sale in and/or importing into the United States without authority products,

12   including, without limitation STEC's Zeus and Zeus$^{IOPS}$ Solid State Drive products, and

13   certain memory products, including without limitation, STEC's SDRAM modules, STEC's

14   DDR modules, and STEC's DDR2 modules. On information and belief, STEC's

15   infringement as described in this paragraph is continuing.

16       20.    On information and belief, STEC's infringement as described in Paragraph 19

17   has been and is willful.

18       21.    By reason of STEC's acts alleged herein, Plaintiffs have suffered damage in an

19   amount to be proved at trial.

20       22.    On information and belief, STEC's continuing infringement as described in

21   Paragraph 19 has caused and will continue to cause Plaintiffs irreparable harm unless

22   enjoined by this Court. Plaintiffs have no adequate remedy at law.

23                            **THIRD CLAIM**
                **INFRINGEMENT OF THE '174 PATENT**
24                   **(35 U.S.C. §§ 271 ET SEQ.)**

25       23.    Plaintiffs refer to and incorporate paragraphs 1 through 22 inclusive, as though

26   fully set forth herein.

27       24.    Plaintiffs are informed and believe and thereon allege that STEC has been and

28   is now infringing the '174 Patent, directly and/or indirectly, by making, using, selling and/or

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT
(DEMAND FOR JURY TRIAL)

offering for sale in and/or importing into the United States without authority products, including, without limitation, STEC's Zeus$^{IOPS}$ Solid State Drive products. On information and belief, STEC's infringement as described in this paragraph is continuing.

25.     On information and belief, STEC's infringement as described in Paragraph 24 has been and is willful.

26.     By reason of STEC's acts alleged herein, Plaintiffs have suffered damage in an amount to be proved at trial.

27.     On information and belief, STEC's continuing infringement as described in Paragraph 24 has caused and will continue to cause Plaintiffs irreparable harm unless enjoined by this Court. Plaintiffs have no adequate remedy at law.

## FOURTH CLAIM
## INFRINGEMENT OF THE '664 PATENT
### (35 U.S.C. §§ 271 ET SEQ.)

28.     Plaintiffs refer to and incorporate paragraphs 1 through 27 inclusive, as though fully set forth herein.

29.     Plaintiffs are informed and believe and thereon allege that STEC has been and is now infringing the '664 Patent, directly and/or indirectly, by making, using, selling and/or offering for sale in and/or importing into the United States without authority products, including, without limitation, STEC's Zeus and Zeus$^{IOPS}$ Fibre Channel Solid State Drive products. On information and belief, STEC's infringement as described in this paragraph is continuing.

30.     On information and belief, STEC's infringement as described in Paragraph 29 has been and is willful.

31.     By reason of STEC's acts alleged herein, Plaintiffs have suffered damage in an amount to be proved at trial

32.     On information and belief, STEC's continuing infringement as described in Paragraph 29 has caused and will continue to cause Plaintiffs irreparable harm unless enjoined by this Court. Plaintiffs have no adequate remedy at law.

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT
(DEMAND FOR JURY TRIAL)

**PRAYER**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and grant the following relief:

33.    Adjudge that STEC has been and is infringing one of more claims of the '647, '480, '174, and '664 Patents;

34.    Adjudge that STEC's infringement has been willful;

35.    Enter an Order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily, and permanently enjoining STEC and all persons in active concert or participation with it, from any further acts of infringement of the Patents identified in Paragraph 33, above;

36.    Order an accounting for damages resulting from STEC's infringement of the Patents identified in paragraph 33 of this Complaint;

37.    Enter an Order, pursuant to 35 U.S.C. § 284, awarding Plaintiffs damages adequate to compensate Plaintiffs for STEC's infringement, but in no event less than a reasonable royalty together with pre-judgment and post-judgment interest;

38.    Enter an Order, pursuant to 35 U.S.C. § 284, and based on STEC's willful infringement, trebling all damages awarded to Plaintiffs and against STEC;

39.    Enter an Order, pursuant to 35 U.S.C. § 285, finding that this is an exceptional case and awarding to Plaintiffs their reasonable attorneys' fees incurred in this action; and

40.    Awarding such other relief as the Court may deem appropriate and just under the circumstances.

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT
(DEMAND FOR JURY TRIAL)

**JURY DEMAND**

Plaintiffs demand a trial by jury of all claims that are triable by a jury.

DATED:  April 14, 2008

                               HELLER EHRMAN LLP

                         By _____

                                Kurt M. Kjelland (Bar No. 172076)
                                (kurt.kjelland@hellerehrman.com)
                                HELLER EHRMAN LLP
                                4350 La Jolla Village Drive
                                San Diego, California  92122-1246
                                Telephone (858) 450-8400
                                Facsimile: (858) 450-8499

                                *Attorneys for Plaintiffs Seagate*
                                *Technology LLC, Seagate Technology*
                                *International, Seagate Singapore*
                                *International Headquarters Pte. Ltd., and*
                                *Maxtor Corporation*

SV 2340727 v8
4/14/08 9:26 AM (42277.0013)

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT
(DEMAND FOR JURY TRIAL)

US006404647B1

(12) **United States Patent**
Minne'

(10) **Patent No.:** **US 6,404,647 B1**
(45) **Date of Patent:** **Jun. 11, 2002**

(54) **SOLID-STATE MASS MEMORY STORAGE DEVICE**

(75) Inventor: **Mark W. Minne'**, Boise, ID (US)

(73) Assignee: **Hewlett-Packard Co.**, Palo Alto, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/645,960**

(22) Filed: **Aug. 24, 2000**

(51) Int. Cl.[7] ................................................. **H05K 7/02**
(52) U.S. Cl. ...................... **361/760**; 361/737; 361/797; 361/684; 361/685
(58) Field of Search ................................. 361/760, 785, 361/797, 800, 802, 803, 820, 684, 715, 748, 736, 737, 685; 713/200, 202; 710/33

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,061,845 A * 10/1991 Pinnavaia ..................... 235/492

5,497,297 A * 3/1996 Kilmer et al. ............... 361/737
5,537,295 A * 7/1996 Van Den bout et al. .... 361/767
5,668,697 A * 9/1997 Dowdy ........................ 361/685

* cited by examiner

*Primary Examiner*—David Martin
*Assistant Examiner*—Hung Bui

(57)        **ABSTRACT**

The present disclosure relates to a solid-state mass memory storage device which comprises a printed circuit assembly and a plurality of nonvolatile, high density storage devices mounted to the printed circuit assembly and electrically connected thereto. The solid-state memory device includes at least one controller mounted to the printed circuit assembly and electrically connected thereto, and a connector mounted to the printed circuit assembly and electrically connected thereto, the connector being adapted to electrically connect the solid-state mass memory storage device to a separate electronic device.

**24 Claims, 8 Drawing Sheets**





*Fig. 1*



***Fig. 2***



**Fig. 3**



**Fig. 4A**



**Fig. 4B**



SECTION A-A

*Fig. 4C*



**Fig. 5**



**Fig. 6**

Case 5:08-cv-01950-JW    Document 1-2    Filed 04/14/2008    Page 8 of 14



**Fig. 7**



**Fig. 8**



**Fig. 9**



**Fig. 10**

US 6,404,647 B1

**1**

# SOLID-STATE MASS MEMORY STORAGE DEVICE

## FIELD OF THE INVENTION

The present disclosure relates to a solid-state mass memory storage device. More particularly, the disclosure relates to a semiconductor mass memory storage device suitable for disk drive replacement.

## BACKGROUND OF THE INVENTION

As the volume of data generated by computing devices increases, the importance of memory space rises. Over the past several years, increases in demand for memory has caused a concomitant increase in the capacity of mass memory storage devices. Conventionally, these mass memory storage devices comprise rotating mass storage devices such as disk drives. Although great strides have been made in disk drive design in terms of capacity and speed, the versatility of conventional disk drives is limited. As a first matter, disk drive technology could soon reach a limit imposed by the superparamagnetic effect (SPE). As is known in the art, SPE is a physical phenomenon in which the energy that holds the magnetic spin in the atoms forming each bit becomes susceptible to ambient thermal energy and, therefore, is subject to random flipping which corrupts the data which the atoms represent. Unfortunately, the miniaturization currently popular in disk drive manufacture exacerbates the SPE problem.

A second limitation of disk drives relates to speed. Because disk drives require moving parts, the speed at which data can be stored on or accessed from the drive is limited by the speed with which the various mechanical parts of the drive can move. To increase this speed, manufacturers have continually increased the speeds at which the internal disks of the drives rotate. However, along with this increased angular velocity comes increased air turbulence and vibration which can cause misregistration of the disk tracks. In addition, to achieve high capacity and high speed, disk drives must be very precise in operation. Typically, disk drives comprise one or more disk platters and a plurality of read-write heads which record and retrieve data from circumferential tracks formed in the platters. The heads are normally moved with servomechanical actuator arms. In order to properly satisfy their record/write functions, the heads must be positioned in very close proximity to the platters, the separation between the heads and the platters typically measuring only fractions of microinches. This level of precision often results in a very fragile mechanism that can be easily damaged by moderate to large vibrations. Such susceptibility is particularly disadvantageous for portable computing devices which are often bumped and/or jolted through normal use.

In addition to fragility, disk drives further present the disadvantage of requiring relatively large amounts of power to operate. This again relates to the fact that disk drives have moving parts which require electrical power. Although not a major concern for plug-in devices such as desktop computers, this power consumption can be problematic for portable devices.

Yet another disadvantage of conventional disk drives is the physical space normally required to house the drives. Again, space constraints normally are not critical for desktop devices. However, space typically is at a premium in portable devices where smaller is often considered better. Due to such space limitations, portable devices typically do not enjoy the redundancy possible with stationary devices

**2**

such as conventional network servers. As is known in the art, such stationary devices normally include a redundant array of inexpensive disks (RAID) which share the data stored in the disk drive. With this arrangement, a failure of a particular disk will not necessarily adversely effect the data stored by the drive in that the data normally can be reconstructed due to the redundancy of the data stored across the several disks. Typically, the desired level of redundancy, e.g. RAID 5 protection, requires a minimum of three disks. Due to the space limitations of portable devices such as notebook computers, however, normally only one such disk is provided. Accordingly, the desired redundancy typically cannot be provided for such devices.

From the foregoing, it can be appreciated that it would be desirable to have a high capacity, high speed, mass memory storage device which uses relatively little power, which is relatively rugged in construction, and which provides for data storage redundancy.

## SUMMARY OF THE INVENTION

The present disclosure relates to a solid-state mass memory storage device. The solid-state mass memory device comprises a printed circuit assembly and a plurality of nonvolatile, high density storage devices mounted to the printed circuit assembly and electrically connected thereto. The solid-state memory device includes at least one controller mounted to the printed circuit assembly and electrically connected thereto, and a connector mounted to the printed circuit assembly and electrically connected thereto, the connector being adapted to electrically connect the solid-state mass memory storage device to a separate electronic device.

In one embodiment, the printed circuit assembly has a form factor equivalent to a conventional disk drive and the at least one controller includes control electronics and firmware which emulate a disk drive such that the device in which said solid-state mass memory storage device will interpret and treat the solid-state mass memory storage device as a disk drive. With such an arrangement, the solid-state mass memory device can be used as a disk drive replacement.

In another embodiment, the high density storage devices are removably mounted in storage device sockets formed in said printed circuit assembly in a redundant array.

The features and advantages of the invention will become apparent upon reading the following specification, when taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention can be better understood with reference to the following drawings. The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention.

FIG. 1 is a perspective view of a mass memory storage device constructed in accordance with the principles of the present invention.

FIG. 2 is a perspective view of an alternative mass memory storage device constructed in accordance with the principles of the present invention.

FIG. 3 is a schematic view of the architecture of the mass memory storage device shown in FIG. 1.

FIGS. 4A–4C are various views of an high density storage device which can be used with the mass memory storage devices shown in FIGS. 1 and 2.

FIG. 5 is a schematic view illustrating field emitters reading from storage areas of the high density storage device shown in FIGS. 4A–4C.

US 6,404,647 B1

3

FIG. 6 is a schematic view illustrating a storage medium of the high density storage device shown in FIGS. 4–5.

FIG. 7 is a perspective view illustrating a first alternative high density storage device which can be used with the mass memory storage devices shown in FIGS. 1 and 2.

FIG. 8 is a perspective detail view illustrating the construction of the first alternative high density storage device shown in FIG. 7.

FIG. 9 is a perspective view illustrating a second alternative high density storage device which can be used with the mass memory storage devices shown in FIGS. 1 and 2.

FIG. 10 is a perspective detail view illustrating the construction of the second alternative high density storage device shown in FIG. 9.

DETAILED DESCRIPTION

Referring now in more detail to the drawings, in which like numerals indicate corresponding parts throughout the several views, FIG. 1 illustrates a mass memory storage device 10 constructed in accordance with the principles of the present invention. As shown in this figure, the mass memory storage device 10 can generally comprise a printed circuit assembly (PCA) 12. Connected to the PCA 12 is a plurality of high density storage devices 14 which are described in greater detail below. Preferably, however, each of the high density storage devices 14 comprises a non-volatile semiconductor device which is resistant to wearout. Normally, each of the high density storage devices 14 is disposed within a storage device socket 15 formed within the PCA 12 such that each individual high density storage device 14 can be removed and replaced, if necessary. Further connected to the PCA 12 is one or more controllers 16. As illustrated in FIG. 1, each controller 16 typically comprises a semiconductor chip which can be electrically connected to the PCA with a plurality of connectors 18. By way of example, the controller 16 can comprise an integrated circuit including a read only memory (ROM) for storing control instructions, a microprocessor for executing these instructions, and a random access memory (RAM) for temporary storage of information. As will be appreciated from the description that follows, the controller 16 can also comprise other circuitry and software with which the controller 16 interfaces with the storage devices 14 and the device 10 host (e.g., personal computer) to ensure a predetermined level of storage redundancy. Also connected to the PCA 12 is a connector 20 which, as indicated in FIG. 1, can be attached to the PCA 12 at one of its ends.

As identified in the foregoing, the mass memory storage device 10 is well-suited for replacing conventional disk drives in various computing devices. Accordingly, the mass memory storage device 10 typically has a form factor suitable for replacement of a disk drive such that the device 10 can be housed in the space in which the disk drive was housed previous to removal. By way of example, the mass memory storage device 10 can have a 3.5 inch, 2.5 inch, 1.8 inch, or 1.0 inch form factor. Although these particular sizes are currently considered standard and therefore desirable, it will be understood by persons having ordinary skill in the art that the mass memory storage device 10 could be sized and configured to replace substantially any disk drive. Additionally, the mass memory storage device 10 can be customized to fit in other specific applications such as handheld computing devices and mobile telephones. In such applications, the device 10 can be designed to fit in industry standard sizes (e.g., standard memory card formats as indicated in FIG. 2). FIG. 2 illustrates a mass memory storage

4

device 10′ in exploded view. As with the storage device 10, the storage device 10′ includes a printed circuit assembly 12′, a plurality of high density storage devices 14, and a connector 20′. Furthermore, the device comprises an internal frame 28 and outer plates 30 which enclose the device 10′.

With reference to FIG. 3, illustrated is an example architecture of the mass memory storage device 10. As indicated in this figure, each of the high density storage devices 14 is connected to a memory bus 22 which is formed within the PCA 12 (FIG. 1). As is further indicated in FIG. 3, the controller(s) 16 can comprise control electronics 24 and firmware 26. Although the mass memory storage device 10 of the present invention is suitable for placement in new computing devices, the mass memory storage device 10 is particularly well-suited for replacement of disk drives in existing devices. To serve this end, therefore, the control electronics 24 and firmware 26 stored within the controller(s) 16 can emulate the disk drive that the storage device 10 is designed to replace such that the computing device would interpret and treat the mass memory storage device 10 as the preexisting disk drive. In such an arrangement, the computing device can be manufactured with a disk drive which can later be replaced with the mass memory storage device 10 of the present invention as an upgrade. Normally, all commands and/or data processed by the mass memory storage device 10 pass through the controller(s) 16.

Normally a plurality of high density storage devices 14 are connected to the PCA 12 in an array. With such an arrangement, the mass memory storage device 10 can provide for redundant storage of data similar to RAID protection. Accordingly, just as in RAID arrangements, a defective device, such as a single high density storage device 14, can be removed from its socket 15 and replaced with a properly functioning high density storage device 14 such that the data previously stored by the defective high density storage device 14 can be reconstructed in the conventional manner. By way of example, a high degree of redundancy is provided such as a level of redundancy equivalent to RAID 5 protection can be achieved, although it will be understood that other levels of protection can be provided. Accordingly, the mass memory storage device 10 of the present invention can be used to provide the level of storage redundancy previously available only from a plurality of disks in a limited amount of space. Therefore, such redundancy can be provided to portable computing devices such as notebook computers.

In addition to the storage redundancy available with the mass memory storage device 10, several other advantages over conventional disk drives exist. For instance, in that the mass memory storage device 10 does not comprise large moving parts, it can be used to restore and retrieve data much more quickly than with conventional disk drives. Furthermore, substantially reduced power consumption and greater resistance to physical damage is provided. Accordingly, the mass memory storage device 10 is particularly well-suited for use in portable devices which operate under battery power and which are transported from place to place. Moreover, the mass memory storage device 10 of the present invention can provide a substantially larger capacity of data storage than can conventional disk drives. As the following discussion elucidates, this increased capacity is made possible due to the high density storage devices 14.

FIGS. 4–6 illustrate a preferred embodiment of an high density storage device 14 suitable for implementation with the mass memory storage device 10 of the present invention which uses atomic resolution storage (ARS). The storage device 14 shown in these figures is disclosed and described

US 6,404,647 B1

5

in detail in U.S. Pat. No. 5,557,596, which is hereby incorporated by reference into the present disclosure. FIG. 4A shows a side cross-sectional view of one such high density storage device 14. As indicated in this figure, the storage device 14 includes a number of field emitters 102, a storage medium 106 having a number of storage areas 108, and a micromover 110 which scans the storage medium 106 with respect to the field emitters 102 or vice versa. In a preferred embodiment, each storage area 108 is responsible for storing one bit of information. Typically, the field emitters 102 are point-emitters having very sharp tips, each tip having a radius of curvature of approximately one nanometer to hundreds of nanometers. During operation, a predetermined potential difference is applied between a field emitter 102 and a corresponding gate such as a circular gate 103 which surrounds it. Due to the sharp tip of the emitter 102, an electron beam current is extracted from the emitter 102 towards the storage area 108. Depending upon the distance between the emitter 102 and the storage medium 106, the type of emitters 102, and the spot size (e.g., bit size) required, electron optics may be useful in focusing the electron beams. Voltage may also be applied to the storage medium 106 to either accelerate or decelerate the field's emitted electrons or to aid in focusing the field emitted electrons. In a preferred embodiment, a casing 120 maintains the storage medium 106 in a partial vacuum, such as at least $10^5$ torr.

In the embodiment shown in FIG. 4A, each field emitter 102 is associated with a corresponding storage area 108. As the micromover 110 scans the medium 106 to different locations, each emitter 102 is positioned above different storage areas. With the micromover 110, an array of field emitters 102 can scan over the storage medium 106. The field emitters 102 are responsible for reading and writing information on the storage areas 108 by means of the electron beams they produce. Thus, the field emitters 102 suitable for the present invention are preferably of the type that produce electron beams which are narrow enough to achieve the desired bit density of the storage medium 106, and which provide the power density of the beam current needed for reading from and writing to the medium 106. A variety of methods are known in the art which are suitable for making such field emitters 102.

In a preferred embodiment, there can be a two-dimensional array of emitters 102, such as 100 by 100 emitters with an emitter pitch of 15 micrometers in both the X and Y directions. Each emitter 102 may access bits in tens of thousands to hundreds of millions of storage areas 108. For example, the emitters 102 can scan over the storage medium 106 (which has a two-dimensional array of storage areas 108) with a periodicity of approximately 1 to 100 nanometers between any two storage areas 108 and the range of the micromover is 15 micrometers. In addition, each of the emitters 102 may be addressed simultaneously or in a multiplexed manner. Such a parallel accessing scheme significantly reduces access time and increases data rate of the storage device 14.

FIG. 4B shows a top view of the storage device 14 and illustrates a two-dimensional array of storage areas 108 and a two-dimensional array of emitters 102. To reduce the number of external circuits, the storage medium 106 can be separated into rows, such as row 140, where each row contains a number of storage areas 108 such that each emitter 102 is responsible for a number of rows. However, in such an embodiment, each emitter 102 need not be responsible for entire length of the rows. Instead, the emitter 102 can be responsible for the storage areas 108 within rows

6

140 through 142, and within the columns 144 through 146. All rows of storage areas accessed by one emitter 102 typically are connected to one external circuit, for example, rows 140 through 142. To address a storage area 108, the emitter 102 responsible for that storage area 108 is activated and is displaced with the micromover 110 to that storage area 108.

A preferred micromover 110 can be made in a variety of ways as long as the micromover 110 has sufficient range and resolution to position the field emitters 102 over the storage areas 108. As a conceptual example, the micromover 110 can be fabricated by a standard semiconductor microfabrication process to scan the medium 106 in the X and Y directions with respect to the casing 120.

FIG. 4C shows a top view of the cross-section A—A of FIG. 4A and illustrates the storage medium 106 being held by two sets of thin-walled microfabricated beams 112–118. The faces of the first set of thin-walled beams are in the X–Z plane, such as 112 and 114. This set of beams may be flexed in the X direction allowing the medium 106 to move in the X direction with respect to the casing 120. The faces of the second set of thin-walled beams are in the X–Z plane, such as 116 and 118. This set of beams allows the medium to move in the Y direction with respect to the casing 120. The storage medium 106 is held by the first set of beams 112, 114, which is connected to a frame 122. The frame is held by the second set of beams 116, 118, which is connected to the casing 120. The field emitters 102 scan over the storage medium 106, or the storage medium 106 scans over the field emitters 102, in the X–Y directions by electrostatic, electromagnetic, or piezoelectric means known in the art.

In use, writing is accomplished by temporarily increasing the power density of the electron beam current to modify the surface state of the storage area 108. Reading, on the other hand, is accomplished by observing the effect of the storage area 108 on the electron beams, or the effect of the electron beams on the storage area 108. Reading is typically accomplished by collecting the secondary and/or backscattered electrons when an electron beam with a lower power density is applied to the storage medium 106. During reading, the power density of the electron beam is kept low enough so that no further writing occurs. One preferred embodiment of the storage medium 106 is a material whose structural state can be changed from crystalline to an amorphous by electron beams. The amorphous state has a different SEEC and BEC than the crystalline state. This leads to a different number of secondary and backscattered electrons emitted from the storage area 108. By measuring the number of secondary and backscattered electrons, the state of the storage area 108 can be determined. To change from the amorphous to the crystalline state, the beam power density can be increased and then slowly decreased. This increase/decrease heats up the amorphous area and then slowly cools it so that the area has time to anneal into its crystalline state. To change from the crystalline to amorphous state, the beam power density is increased to a high level and then rapidly. An example of one such type of material is germanium telluride (GeTe) and ternary alloys based on GeTe.

FIG. 5 schematically illustrates the field of emitters 102 reading from the storage medium 106. In this figure, the state of one storage area 150 has been altered, while the state of another storage area 108 has not. When electrons bombard a storage area 108, both the secondary electrons and back-scattered electrons will be collected by the electron collectors, such as 152. An area that has been modified will produce a different number of secondary electrons and backscattered electrons, as compared to an area that has not

US 6,404,647 B1

7

been modified. The difference may be greater or lesser depending upon the type of material and the type of modification made. By monitoring the magnitude of the signal current collected by the electron collectors 152, the state of and, in turn, the bit stored in the storage area can be identified.

FIG. 6 illustrates a diode approach for construction of the storage device 14. In this approach, the storage medium 106 is based on a diode structure 200, which can be a PN junction, a schottky, barrier or any other type of electronic valve. Although FIG. 6 illustrates a particular external circuit 202, it will be appreciated that this circuit is provided for purposes of example only. The basic idea is to store bits by locally altering the surface of a diode in such a way that collection efficiency for minority carriers generated by the altered region is different from that of an unaltered region. The collection efficiency for minority carriers is defined as the fraction of minority carriers generated by the instant electrons which are swept across the diode junction 204 when it is biased by an external circuit 202 to cause a signal current 206 to flow in the external circuit 202. In use, the field emitters 102 emit narrow beams of electrons onto the surface of the diode 200. The incident electrons excite electron-hole pairs near the surface of the diode 200. Because the diode 200 is reverse-biased by an external circuit 202, the minority carriers that are generated by the incident electrons are swept toward the diode junction 204. Electrons that reach the PN junction 204 are then swept across the junction 204. Accordingly, minority carriers that do not recombine with majority carriers before reaching the junction are swept across the junction, causing a current flow in the external circuit 202.

Writing onto the diode 200 is accomplished by increasing the power density of the electron beam enough to locally alter the physical properties of the diode 200. This alteration will affect the number of minority carriers swept across the junction 204 when the same area is radiated with a lower power density read electron beam. For instance, the recombination rate in a written area 250 could be increased relative to an unwritten area 108 so that the minority carriers generated in the written area 250 have an increased probability of recombining with minority carriers before they have a chance to reach and cross the junction 204. Hence, a smaller current flows in the external circuit 202 when the read electron beam is incident upon a written area 250 than when it is incident upon an unwritten area 208. Conversely, it is also possible to start with a diode structure having a high recombination rate and to write bits by locally reducing the recombination rate. The magnitude of the current resulting from the minority carriers depends upon the state of the storage area 106 and the current continues the output signal 206 to indicate the bit stored.

FIGS. 7 and 8 illustrate a first alternative construction of the high density storage devices 14 shown in FIG. 1. In particular, illustrated is a magnetic random access memory (MRAM) device 14'. As indicated in FIG. 7, the MRAM device 14' is a solid-state memory storage device which generally comprises a plurality of cells 300 which serve as magnetic domains and a plurality of conductor bars 302 and 304. Typically, the bars 302, 304 are arranged in first and second parallel planes 306 and 308 with the bars 302 of the first plane 306 aligned perpendicularly with the bars 304 of the second plane 308. Accordingly, the bars 302, 304 form intersection points 310. As further indicated in FIG. 7, one cell 300 is disposed intermediate the two planes 306, 308 at each intersection point 310 formed by the bars 304, 308. Therefore, as shown in the detail view of FIG. 8, one cell

8

300 is sandwiched between a first bar 302 and a second bar 304 at the two bars' intersection point 306. As indicated in FIG. 8, each cell 300 comprises a pinned magnetic layer 312 (i.e., a layer which is permanently magnetized in a predetermined direction), a relatively thin dielectric layer 314, and a free magnetic sense layer 316 (i.e., a layer whose magnetization direction can be selectively changed). By way of example, the bars 302, 304 and their associated cells can be formed on one or more substrates to create an integrated device.

In use, writing is accomplished by passing current, i, through the conductor bars 302, 304 to create magnetic fields $H_x$ and $H_y$ which produce resultant vector addition magnetic forces, M, at the intersection points 310. These magnetic forces are sufficient to selectively cause the magnetic orientation of the sense layers 316 to either coincide with the magnetic direction of the pinned magnetic layer 312 or to oppose it. Detection of the written state of the sense layer's magnetism can then be accomplished by determining the differential resistance in the tunneling magneto-resistive junction between the two conductor bars 302, 304 through the sense layer 316, the dielectric layer 314, and the pinned layer 312 depending upon the pinned layer's magnetic orientation.

FIGS. 9 and 10 illustrate a second alternative construction of the high density storage devices 14 shown in FIG. 1. In this alternative, the storage device 14'' is a stylus storage device which comprises a storage medium 400 composed of a polymeric material and a 2-D stylus array chip 402. The 2-D stylus array chip 402 comprises a plurality of styluses 404, each having a sharp tip 406 (e.g., radius of curvature of approximately 20 nm) which rests upon the smooth surface of the storage medium. In use, writing is accomplished by passing a current through the stylus 404 to briefly heat the tip 406 to a high temperature (e.g., 400° C.). The heated tip 406 causes the surface of the medium 400 to melt, forming an indentation 408. When a series of indentations 408 are formed, the dips and flats can be treated as 0's and 1's. To read this information, the stylus tip 406 is heated to a temperature below the melting point of the polymeric material (e.g., 350° C.). When the stylus 404 drops into an indentation 408 formed in the medium 400, the heat from the tip 406 of the stylus 404 dissipates. This temperature drop can then be detected by monitoring the electrical resistance of the stylus 404.

Although specific embodiments of the high density storage devices 14 have been provided herein, it will be appreciated that these embodiments are provided by way of example only. Most preferably, however, the storage device 14 used will have high capacity, be nonvolitile, and resistant to read/write wearout. Irrespective of the particular form of the high density storage device 14 used, several advantages can be obtained through use of the mass memory storage device 10 described herein. First, the storage device described in this disclosure is less susceptible to SPE as compared to conventional disk drives. Second, the storage device can read and write with greater speed than conventional disk drives in that the moving parts of the device are of such low mass. Furthermore, because of this low mass, the presently disclosed storage device normally is more robust than conventional disk drives and typically requires less power to operate. Moreover, the herein described storage device usually can be manufactured smaller than conventional disk drives and therefore a desirable amount of storage redundancy can be obtained, even where space is limited.

While particular embodiments of the invention have been disclosed in detail in the foregoing description and drawings

US 6,404,647 B1

9

for purposes of example, it will be understood by those skilled in the art that variations and modifications thereof can be made without departing from the spirit and scope of the invention as set forth in the following claims.

What is claimed is:

1. A solid-state mass memory storage device, comprising:

a printed circuit assembly;

a plurality of nonvolatile, high density storage devices mounted to said printed circuit assembly and electrically connected thereto;

at least one controller mounted to said printed circuit assembly and electrically connected thereto; and

a connector mounted to said printed circuit assembly and electrically connected thereto, said connector being adapted to electrically connect said solid-state mass memory storage device to a separate electronic device;

wherein said mass memory storage device has a form factor equivalent to that of a conventional disk drive such that said storage device is configured for replacing a disk drive of a computing device.

2. The device of claim 1, wherein said printed circuit assembly has a form factor equivalent to an industry standard memory card.

3. The device of claim 1, wherein each of said high density storage devices is mounted in a storage device socket formed in said printed circuit assembly.

4. The device of claim 3, wherein said high density storage devices are selectively removable from said storage device sockets.

5. The device of claim 1, wherein said high density storage devices are electrically connected in a redundant array such that said high density storage devices redundantly store information.

6. The device of claim 5, wherein said array is arranged so as to provide a level of redundancy equivalent to RAID 5 protection.

7. The device of claim 1, wherein said at least one controller includes control electronics and firmware which emulate a disk drive such that the device in which said solid-state mass memory storage device is used will interpret and treat said solid-state mass memory storage device as a disk drive.

8. The device of claim 1, wherein said high density storage device is an atomic resolution storage device.

9. The device of claim 1, wherein said high density storage device is a magnetic random access memory device.

10. The device of claim 1, wherein said high density storage device is a stylus storage device.

11. The device of claim 1, wherein said mass memory storage device has a form factor equivalent to at least one of a 3.5 inch disk drive, a 2.5 inch disk drive, a 1.8 inch disk drive, and a 1.0 inch disk drive.

12. A solid-state mass memory storage device for disk drive replacement, comprising:

a printed circuit assembly having a form factor equivalent to a conventional disk drive and being provided with a plurality of storage device sockets;

a plurality of nonvolatile, high density storage devices removably mounted to said printed circuit assembly

10

and electrically connected thereto via said storage device sockets;

at least one controller mounted to said printed circuit assembly and electrically connected thereto; and

a connector mounted to said printed circuit assembly and electrically connected thereto, said connector being adapted to electrically connect said solid-state mass memory storage device to a separate electronic device.

13. The device of claim 12, wherein said high density storage devices are electrically connected in a redundant array such that said high density storage devices redundantly store information.

14. The device of claim 12, wherein said array is arranged so as to provide a level of redundancy equivalent to RAID 5 protection.

15. The device of claim 12, wherein said at least one controller includes control electronics and firmware which emulate a disk drive such that the device in which said solid-state mass memory storage device is used will interpret and treat said solid-state mass memory storage device as a disk drive.

16. The device of claim 12, wherein said high density storage device is an atomic resolution storage device.

17. The device of claim 12, wherein said high density storage device is a magnetic random access memory device.

18. The device of claim 12, wherein said high density storage device is a stylus storage device.

19. A method of constructing a disk drive replacement storage device, comprising:

forming a printed circuit assembly having a form factor equivalent to a conventional disk drive and a plurality of storage device sockets which are electrically connected to each other;

mounting a plurality of high density storage devices to the storage device sockets of the printed circuit assembly; and

mounting at least one controller to the printed circuit assembly, the at least one controller having control electronics and firmware which emulate a disk drive such that the device in which the disk drive replacement storage device is used will interpret and treat the disk drive replacement storage device as a disk drive.

20. The method claim 19, further comprising electrically connecting the high density storage devices in a redundant array such that the high density storage devices redundantly store information.

21. The method of claim 20, wherein the array is arranged so as to provide a level of redundancy equivalent to RAID 5 protection.

22. The method of claim 19, wherein said high density storage device is an atomic resolution storage device.

23. The method of claim 19, wherein said high density storage device is a magnetic random access memory device.

24. The method of claim 19, wherein said high density storage device is stylus storage device.

* * * * *



US006849480B1

(12) **United States Patent**
Low et al.

(10) Patent No.:     **US 6,849,480 B1**
(45) Date of Patent:     **Feb. 1, 2005**

(54) **SURFACE MOUNT IC STACKING METHOD AND DEVICE**

(75) Inventors: **Chau Chin Low**, Freemont, CA (US); **Oscar Woo**, Santa Cruz, CA (US); **Michael R. Fabry**, Apple Valley, MN (US); **Terry A. Junge**, Scotts Valley, CA (US); **Tiang Fee Yin**, Singapore (SG); **Choon An Aw**, Singapore (SG); **Jonathan E. Olson**, Minneapolis, MN (US)

(73) Assignee: **Seagate Technology LLC**, Scotts Valley, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 552 days.

(21) Appl. No.: **09/427,226**

(22) Filed: **Oct. 26, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/133,019, filed on May 7, 1999.

(51) Int. Cl.$^7$ ......................... **H01L 21/44**; H01L 21/48; H01L 21/50; H01L 21/28; H01L 21/3205

(52) U.S. Cl. ......................................... **438/109**; 438/601

(58) Field of Search .................................. 438/109, 601; 29/729, 757, 760

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,311,401 A | 5/1994 | Gates, Jr. et al. | |
| 5,313,096 A | 5/1994 | Edie | |
| 5,325,268 A | 6/1994 | Nachnani et al. | |
| 5,334,875 A | 8/1994 | Sugano et al. | |
| 5,346,402 A | 9/1994 | Yashuo et al. | |
| 5,362,984 A | 11/1994 | Konda et al. | |
| 5,373,188 A | 12/1994 | Michii et al. | |
| 5,380,681 A | 1/1995 | Hsu | |
| 5,382,827 A | 1/1995 | Wang et al. | |
| 5,422,435 A | 6/1995 | Takiar et al. | |
| 5,432,729 A | 7/1995 | Carson et al. | |
| 5,441,918 A | 8/1995 | Morisaki et al. | |
| 5,466,634 A | 11/1995 | Beilstein, Jr. et al. | |
| 5,475,262 A | 12/1995 | Wang et al. | |
| 5,479,051 A | 12/1995 | Waki et al. | |
| 5,484,959 A | 1/1996 | Burns | |
| 5,490,041 A | 2/1996 | Furukawa et al. | |
| 5,514,907 A | 5/1996 | Moshayedi | |
| 5,581,498 A | 12/1996 | Ludwig et al. | |
| 5,612,570 A | 3/1997 | Eide et al. | |
| 5,629,563 A | 5/1997 | Takiar et al. | |
| 5,723,901 A | 3/1998 | Katsumata | |
| 5,748,452 A | 5/1998 | Londa | |
| 5,768,772 A | * 6/1998 | Buechele ..................... 29/830 |
| 5,783,870 A | 7/1998 | Mostafazadeh et al. | |
| 5,786,237 A | 7/1998 | Cockerill et al. | |

(List continued on next page.)

OTHER PUBLICATIONS

IEEE 100: the authoritative dictionary of IEEE standards Terms, IEEE, 7th ed., 2000, pp. 166, 570, 787.*
Harper, Charles A., "Electronic Packaging, Microelectronics, and Interconnection Dictionary," 1993, p. 32.*

*Primary Examiner*—Carl Whitehead, Jr.
*Assistant Examiner*—Nema Berezny
(74) *Attorney, Agent, or Firm*—Derek J. Berger

(57)     **ABSTRACT**

Packaged surface mount (SMT) chips having matched top contacts and bottom contacts are stacked. Chip features are selected to provide the desired connectivity between chip layers with a greater ease of manufacture. In one embodiment, additional spacing and routing layers are optionally provided between layers. In another, chips are differentiated by optionally providing different conductor and/or nonvolatile cell configurations. In yet another, a minority of a substrate's contacts are configured for aligning with a dielectric region of a spacing layer or substrate to create very low capacitance signal paths between stacked chips.

**13 Claims, 16 Drawing Sheets**



**US 6,849,480 B1**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,801,439 | A | 9/1998 | Fujisawa et al. |
| 5,818,748 | A | 10/1998 | Bertin et al. |
| 5,838,060 | A | 11/1998 | Comer |
| RE36,077 | E | 2/1999 | Michii et al. |
| 5,892,287 | A | 4/1999 | Hoffman et al. |
| 5,910,682 | A | 6/1999 | Song |
| 5,910,685 | A | 6/1999 | Watanabe et al. |
| 5,915,167 | A | 6/1999 | Leedy |

| | | | | |
|---|---|---|---|---|
| 5,998,864 | A | 12/1999 | Khandros et al. | |
| 6,033,931 | A | 3/2000 | Hoffman et al. | |
| 6,072,234 | A | 6/2000 | Camien et al. | |
| 6,117,704 | A | 9/2000 | Yamaguchi et al. | |
| 6,157,541 | A | 12/2000 | Hacke | |
| 6,168,969 | B1 * | 1/2001 | Farnworth | ................ 438/106 |
| 6,172,874 | B1 | 1/2001 | Bartilson | |
| 6,195,268 | B1 | 2/2001 | Eide | |

* cited by examiner

FIG. 1
( PRIOR ART )



FIG. 2
( PRIOR ART )



FIG. 3
( PRIOR ART )



**FIG. 4**



FIG. 5



FIG. 6



FIG. 7





**FIG. 8**



**FIG. 9**

FIG. 10





FIG. 11

**FIG. 12**



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17





FIG. 18

1810 — BEGIN

1820 — BUILD & SEAL N*L CHIPS TO BE STACKED WHERE N = THE QUANTITY OF CHIPS PER LAYER AND L = THE NUMBER OF LAYERS

1830 — MODIFY THE ELECTRICAL CHARACTERISTICS OF AT LEAST L−1 OF THE CHIPS TO BE VERTICALLY ALIGNED

1840 — ASSEMBLE THE STACKED DEVICE

1850 — INSTALL THE DEVICE ONTO A SUBSTRATE

1860 — END

FIG. 19

1910 — BEGIN

1920 — MOUNT DIES INTO FIRST & SECOND PACKAGES

1930 — INSTALL FIRST CONDUIT CONFIGURATION INTO FIRST IC PACKAGE

1940 — INSTALL SECOND, DIFFERENT CONDUIT CONFIGURATION INTO SECOND IC PACKAGE

1950 — STACK FIRST AND SECOND IC PACKAGES

1960 — END

FIG. 20



US 6,849,480 B1

1

## SURFACE MOUNT IC STACKING METHOD AND DEVICE

### RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 60/133,019 filed on May 7, 1999.

### FIELD OF THE INVENTION

The present invention relates generally to methods and devices for increasing the density of integrated circuits (IC's) placed on a substrate such as a printed circuit board (PCB), and more particularly to methods and devices for stacking chips comprising surface mount technology (SMT) chip packages.

### BACKGROUND OF THE INVENTION

For several years, makers of electronic and electromechanical systems have known that IC stacking methods and stacked devices can sometimes allow more components to be mounted in a given area of a substrate. For example, U.S. Pat. No. 5,612,570 (filed Apr. 13, 1995 by Eide et al.) teaches a configuration for stacking one chip into each of several frames, and then stacking the frames. Signal routing between the chip leads and the frames is provided by traces routed through the frames.

Although many known stacking methods are capable of providing the desired PCB population density, a first problem not yet adequately addressed is that identical (or very similar) chips in a vertically aligned group have required at least as many interfaces containing routing (i.e. horizontally offset vertical conductors) as chip layers. Each alternation between a chip layer and an interface structure adds to the cost of the handling equipment required to assemble a stack.

U.S. Pat. No. 4,956,694 (filed Nov. 4, 1988 by Eide et al.) teaches a configuration for stacking slightly differing LCC chips onto a small substrate that can then be mounted sideways on a larger substrate. This stacked device relies on these slight differences between the dies to function, because exactly identical IC dies connected exactly in parallel are unable to perform logic functions individually. A second problem not yet adequately addressed in the art is that stacked device configurations of this type require that the dies be fabricated using different masks, and are subsequently maintained in distinct inventories. A need thus exists for stacked devices that can be made with dies that are fabricated identically and then made into distinct chips at a later step of manufacture.

A third problem that exists in the art is very long, high capacitance conduits typically provided between internal circuit elements on different dies. Although some prior stacking configurations incidentally reduce the length and capacitance of such conduits as compared to electrical paths comprising internal traces of a substrate, all known configurations suffer from either difficulty of manufacture or relatively poor performance.

### SUMMARY OF THE INVENTION

Methods and devices are shown which can solve one or more of these problems. The present invention is useful for stacking packaged surface mount (SMT) chips featuring conductors extending to the outside of the package, the conductors each being of a type that has a top contact and a bottom contact relative to the substrate on which the stacked device is to be mounted. Top contacts of each chip in the top layer are desirably left entirely unconnected, and bottom

2

contacts of each chip the bottom layer are desirably configured for coupling with a planar substrate surface. Preferred methods and devices of the present invention simplify manufacturing by allowing chips that must eventually be differentiated to remain substantially identical longer into the manufacturing process.

A first embodiment of the present invention provides a stacking method and device featuring simplified assembly by sandwiching any offset conductors or horizontal routing between the chips in the stack, thereby allowing a lesser number of interfaces than chip layers. This provides a mechanism for individual signal coupling so that even perfectly identical chips can be accommodated. Detailed examples are shown in FIGS. 4–12. These include specific arrangements for testing, heat sinks, singulation, and interface construction.

A second embodiment of the present invention provides a stacking method and device featuring chips configured to be vertically aligned in a stack, differentiated by providing different conductor and/or nonvolatile cell configurations. This allows commonality between all of the dies and packages to be maintained at least until the conductors are installed. Detailed examples are shown in FIGS. 12–20. These include specific arrangements for controlling substrate connectivity, accommodating dissimilar chips, accommodating identical chips, differentiating identical devices before or after stacking, and modifying chips using electrical, mechanical, or optical means.

A third embodiment of the present invention provides a stacking method and device featuring a minority of a chip's contacts configured for aligning with a dielectric region of a spacing layer or substrate. This allows very short, low capacitance signal paths between stacked chips in a very easily manufacturable configuration. Detailed examples are shown in FIGS. 5, 12, 15 & 17. These include specific arrangements for assembly, limited horizontal routing on the substrate surface, and within-chip routing.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a packaged memory chip and a routing layer of the prior art.

FIG. 2 shows a known stacked device comprising the chip of FIG. 1.

FIG. 3 shows a prior art electromechanical system having a crowded controller board of a general type that could benefit by the present invention.

FIG. 4 shows a crowded controller board of the present invention, modified from that of FIG. 3 by the substitution of stacked devices of the present invention.

FIG. 5 shows a cross sectional view of stacked devices of the present invention in a succession of stages of manufacture.

FIG. 6 shows further detail one method of the present invention, compatible with FIG. 5.

FIG. 7 shows a stacked device of the present invention in an exploded view, tilted upward to reveal the undersides of chips, the device featuring packages with gull-wing type leads and a heat sink.

FIG. 8 shows a cross-sectional view of the stacked device of FIG. 7.

FIG. 9 shows a cross-sectional view of an a lead-on-lead stacked device of the present invention.

FIG. 10 shows a stacking configuration showing more than one chip per layer, also featuring a single piece routing layer having a widened portion for routing outside the chips' footprints.

3

FIG. 11 shows a partially exploded view of an inventive stacked device comprising three chips and two interfaces.

FIG. 12 shows a detailed example of stacked LCC's tilted apart to show their interiors (showing inventive features) and the interfaces between chips (shown generically).

FIG. 13 shows a Venn diagram for ascertaining a suitable package size for a given set of chips to be stacked, especially useful for dissimilar chips.

FIG. 14 shows a Venn diagram like that of FIG. 13 adapted for coupling more than two layers.

FIG. 15 shows a stacked device of the present invention somewhat similar to that of FIG. 12, showing other features for differentiating substantially identical chips.

FIG. 16 shows an inventive configuration of in-package conduits and unconnected contacts for individual signal coupling to each chip of a 2-layer stacked device.

FIG. 17 shows another inventive configuration of unconnected contacts for differentiating the chips of a stacked device, substantially consistent with FIG. 15.

FIG. 18 shows a flowchart of a method of the present invention compatible with FIG. 17.

FIG. 19 shows another flowchart of the present invention compatible with FIGS. 15, 16 & 20.

FIG. 20 shows several unconnected contacts in a configuration of the present invention compatible with FIG. 19 in a 3-layer stack.

DETAILED DESCRIPTION

Although each of the many examples below shows more than enough detail to allow those skilled in the art to practice the present invention, subject matter regarded as the invention is broader than any single example below. The scope of the present invention is distinctly defined, however, in the claims at the end of this document. Definitions of many terms used in this document are provided, all consistent with common usage in the art but some described with greater specificity.

Stacked devices of the present invention are configured to be coupled to a substrate. "Top," "bottom," "upper" and the like as used herein are described with reference to the substrate that is to be "below" the stacked device, or to an arbitrarily selected "bottom" of the stacked device where the stack is to be mounted sideways.

A "conductor" is a continuous structure or material having electrical conductivity about equal to that of a metal. A "contact" is a surface of a conductor configured to touch a portion of another conductor to form a physical and electrical coupling simultaneously. The "contacts" of an IC die as used herein refer to those contacts on the exterior of the die.

"Internal circuitry" on an IC die includes resistors and active elements on the die, but excludes ordinary signal traces and fusible links connected very near to a die contact.

"Coupled directly" as used herein refers to objects that are physically touching. Two items are said to be physically coupled "indirectly" if they are both directly coupled to a third item or to a binder. Irrespective of physical coupling, two conductors are "electrically coupled" if there is a continuous conductive path between them. Two conductors are electrically coupled "internally" if they both extend within an object such as an IC package and a continuous conductive path exists between them within the object.

An IC "package" as used herein is a surface mount technology (SMT) package having a dielectric body having

4

a cavity large enough to accommodate the die(s) for which the package was intended. It also has contacts inside the body for electrically coupling with the die(s) and contacts external to the body that are electrically coupled to the internal contacts. Packages used in the present invention each have several conductors each having matched "upper" and "lower" external contacts configured to facilitate chip stacking. Contacts of a "matched" pair residing on opposite sides of a package lead do not touch each other.

IC packages of the present invention include conventional ceramic or plastic packages for use with IC dies. The term "package" as used herein excludes components conventionally added to the inside of a package (e.g. bare dice, epoxy-coated dice, tape-based die carriers such as TAB components, and bond wires), but includes package lids and several routed conductors. Typically each package conductor includes an internal contact configured to be electrically coupled to an IC die and one or more external contacts configured to be electrically coupled to a socket, a PCB pad, a jumper, or some other conductor. External contacts may include a part of the top and a part of the bottom of a gull-wing or flat pack lead, for example.

Each conventional IC package includes a dielectric body having a cavity large enough to accommodate the die(s) for which the package was intended. It also has contacts inside the body for electrically coupling with the die(s) and contacts external to the body that are electrically coupled to the internal contacts. Surface mount IC packages used in the present invention have matched, non-overlapping "upper" and "lower" external contacts to facilitate chip stacking. Conventional packages typically have a simple body shape such as a rectangular solid, outside of which leads may protrude. Two IC packages are said to be "internally identical" if the portion of the package inside the simple shape is the same, whether or not the externally protruding leads are identical.

"Internally connectable" as used herein refers to conductors and conductive contacts that are configured so that they readily could be connected to provide an internal electrical coupling. "Unconnected" as used herein refers to items that are (or were) configured to be internally connectable to a target conductor (i.e., of an IC die and/or package), but which are separated from the target by a dielectric. A "no-connect" is another art-known term describing certain bifurcated conductors and their contacts. Except for the preceding sentence, a "conductor" as used anywhere in this document means a contiguous conductor.

A "chip" as used herein refers to a package containing at least one die, the package having external contacts electrically coupled to at least some of electrically operative contacts of the at least one die.

As used herein, the term "footprint" refers to the two-dimensional plan, layout, or projected area of an element at a given plane, such as the mounting layout of the chip.

"Similar" dies as used herein include identically manufactured dies and dies having substantially all of their electrically operative contacts in common, that majority being in exactly the same sequence and in the same nominal location relative to the internal circuitry of each. "Substantially all" as used herein means at least about 90%. Thus, a package that can accommodate a complex die can virtually always accommodate a "similar" but simpler die. "Dissimilar" as used herein refers to dies that do not comply with this definition, or to chips that contain dissimilar dies.

"Substantially identical" as used herein refers to dies one of which has all of its electrically operative contacts in the

US 6,849,480 B1

5

same nominal location relative to its internal circuitry as those of the other die. Dies are those made from masks generated from identical data files or having all of the same structures in the same nominal arrangement are "substantially identical." Even dies differing by a contact or two may still be "substantially identical" if one can serve the intended application of the other and the differences are such that a given manufacturer-assigned product number need not change. Multiple revision numbers associated with a single product are not uncommon in the IC industry.

"Identical" as used herein refers to dies which have all of their electrically operative contacts identically configured. Manufacturing differences such as those resulting from processing variations or differences between identically-manufactured masks will not prevent two dies from being identical, provided one of them can function for the intended purpose of the other. "Different" is used herein to refer to dies that fail to meet the definition of "identical" (such as those that have modified electrical characteristics, even if they are still "substantially identical").

Two packages are deemed "identical" herein if one of them can function for the intended purpose of the other. Two packages are "internally" identical if they are identical except for the shapes of leads protruding from the package bodies. Packages can be internally identical even if the contents of the cavities differ from one another. Two packages may be "substantially" identical even if their contacts differ by a contact or two, and they are "similar" if substantially all of their electrically operative contacts have the same general arrangement in their intended application.

A package "interior" as used herein refers to the body of the package and the contents of the package cavity. These contents typically include internal contacts coupled to die contacts by a "conduit configuration." The term "conduit configuration" as used herein refers to the number of conduits placed in a package, the selection of which die and package interior contacts are to be coupled electrically by the conduits, and the approximate locations of those contacts relative to the die or package interior. Thus, a "bond map" comprising the die- and package-specific information needed by a wire bonding machine is an example of a sufficiently complete "conduit configuration," even if it lacks specific information about loop height.

An "interface" as used herein refers to a given set of the contacts on each of two entities, together with the conductors coupled to those contacts and the structural members containing those conductors outside two entities. Die interfaces as discussed herein therefore each include at least two IC packages. Chip interfaces discussed herein may comprises nothing more than a pattern of solder bonds.

FIG. 1 shows a packaged memory chip 616 and a routing layer 606 of the prior art. The packaged chip 616 has eighteen gull wing leads 699, each having a bottom contact 691 that is placed against a corresponding inner contact 696 on the routing layer 606. The routing layer 606 insulates the inner contacts 696 from each other and provides internal conductive paths to several of the outer contacts 697. Each outer contact 697 is also electrically coupled to a bottom contact 698 on the underside of the routing layer 606. Most of the outer contacts 697 couple via an "ordinary" vertical conductor 693, but a few of the outer contacts 697 couple via an "offset" vertical conductor 694.

FIG. 2 shows a known device 600 such as that taught in U.S. Pat. No. 5,612,570 mounted to a substrate 605. The device 600 is formed of several identical routing layers 606,607,608 each holding a corresponding, packaged

6

chip 616,617,618. Each of the outer contacts 697 of bottom routing layer 606 couple directly to a corresponding bottom contact 698 on the underside the second routing layer 607. Similarly, bottom contacts 698 on the underside of the bottom routing layer 606 couple directly to contacts (not shown) on the substrate 605.

By a known surface mount stacking interface scheme combining vertical conductors 693 with offset conductors 694, each of the packaged chips 616,617,618 has "individual signal coupling"—i.e., has at least one signal path that is electrically isolated from the other packaged chips in the stacked device 600. This allows each of the packaged chips 606,607,608 to be addressed uniquely, even if identical packaged chips are used.

FIG. 3 shows, in exploded form, Seagate's Cheetah 18LP disc drive as sold prior to this writing. As explained below, this electromechanical system requires stacked IC devices to comply with its form factor specifications. Briefly, the disc drive 10 includes a housing base 42 and a top cover 490, which engage a gasket 495 to form a sealed housing that maintains the clean environment inside the disc drive 10. A plurality of disks 46 is mounted for rotation on a spindle motor hub 44. A plurality of transducer heads 60 is mounted to an actuator body 56. The actuator body 56 is adapted for pivotal motion under control of a voice coil motor (VCM) comprising a voice coil 54 and magnets 50 to controllably move heads 60 to a desired track 48 along an arcuate path 62. Signals used to control the VCM and the heads 60 pass via a flex circuit 64 and a connector 68 to and from electronic circuitry on controller board 500. As shown, the controller board 500 comprises a fibre channel interface 550, a serial port connector 560, and a spindle connector 570. In fact, the board 500 is extremely crowded.

FIG. 4 shows a controller board 501 modified from the board 500 of FIG. 3 by the substitution of stacked devices 580,581 of the present invention. All of the upper external contacts of one stacked device 580 are fully exposed to air, thus making the external leads and spacing layer segments 584 beneath the leads visible. All of the upper external contacts of the other stacked device 581 are fully coated with a protective (solid) dielectric 585 such as a deposited epoxy. All of the chips shown are preferably coupled to the board 501 by a single reflow operation.

FIG. 5 shows a cross sectional view of stacked devices of the present invention in various stages of manufacture. A spacer layer 880 such as a printed circuit board is provided with solder paste on contacts 891,892 on its opposite surfaces. After preparing the layer, at least one chip 270 is placed on a work surface 83. An assembly component comprising a spacing layer 880 is placed in contact with the leads of each chip 270. At least one more layer of chips 170 is provided so that some of its contacts couple directly to contacts 892 on the spacing layer 880 with solder 87. Electrical probes 86 are used to test which stacked devices 580,581 are functional. A clamping surface 88 is used to secure the devices while they are separated into individual units (singulated) with a cutting device 79 such as a router. The singulated devices are removed from the assembly fixture 83,88. They may then be coupled to a substrate 503 having internal conductors 568 such as by soldering to contacts 592. In one embodiment, at least one bottom contact of the stacked device couples only to a dielectric region of the substrate and all the top contacts of the top chip 270 in the stack is coated by a dielectric 585. Alternatively, at least one of the substrate contacts 592 coupled to a stacked device 580 is electrically isolated from any of the substrate's internal conductors 568.

7

8

FIG. 6 shows further detail of the present inventive method compatible with FIG. 5. Printed circuit board(s) are inspected 1220 as known in the art, then prepared 1225 and screen printed with solder paste 1230. Chips are picked & first placed onto the reflow pallet 1240, then additional boards(s) and chips are placed onto the reflow pallet 1245, 1250. The top cover of the reflow pallet is placed 1255 and a reflow is performed 1265 as known in the art. The devices undergo electrical test 1270. In a preferred embodiment, step 1270 more particularly comprises a step of modifying the electrical characteristics of each of the vertically-aligned chips in the stack, or at least all but one of them. The steps are then singulated 1280 and inspected 1285 and any necessary rework is performed 1290 prior to installation onto a substrate.

FIG. 7 shows a stacked device 582 of the present invention in an exploded view, tilted upward to reveal the undersides 171,271 of leaded chips 180,280 in a stack. The bottom chip 180 is a packaged device having eighteen conductors 101–118 with gull-wing leads that protrude downward and outward. As shown, each of the conductors 101–118 has an upper contact 192 configured for direct contact with a two-piece spacing layer 880 and a lower contact 191 which may be configured for direct contact with a primary PCB (not shown).

A heat sink 780 is provided, shaped like a capital "I" with two narrow segments connected by a perpendicular segment. Optionally, it contacts the bottom chip 180 directly and is affixed there with a high temperature silicone adhesive. Although heat sinks are usually used only for larger chips, a heat sink 780 is shown with unusually small chips 180,280 for purposes of illustrative. Interface 199 comprises the depicted spacing layer 880 and offset conductor routing layer 980. According to a preferred embodiment of the present invention, a stack having L chip layers will need only (L-1) such interfaces for proper signal routing. Spacing layer 880 and routing layer 980 are desirably affixed to one another prior to assembly with the chips 180,280. Most conductors 801–818,901–918 of these layers 880,980 have contacts configured for direct coupling with a contact of the other layer, so this affixation is conveniently performed with solder paste.

As shown, a trace 168 on the bottom 971 of the routing layer 980 couples conductor 901 to conductor 913, thus coupling four package conductors 101,113,201,213. If the chips 180,280 in the stack are identical, this trace does not enable individual signal coupling to these package conductors 101,113,201,213. A trace on a routing layer having conductors adapted for coupling to conductors on two or more sides of a stacked IC package 180 nevertheless provides a novel latitude over either a two-piece spacing layer 880 or a frame 606 of FIG. 1, alone. Namely, the routing layer 980 as shown does not add appreciably to the footprint of the stacked device 582, even if the heat sink 780 is omitted.

As shown, routing board 980 has another feature that provides individual signal coupling. Unlike the other conductors 901–911,913–918 comprising contacts of routing layer 980, conductor 912 as shown comprises contacts 991,992 on only one of its surfaces 971,972. A preferred embodiment of the present invention features a routing layer featuring at least one offset conductor 169 constructed by methods known by those skilled in the art. In a preferred embodiment of the present invention, conductors 114 and 214 are no-connects (i.e., package conductors comprising contacts that are not internally connected to the chips' internal circuits) and the chips 180,280 are identical. Thus,

as shown, conductor 112 is electrically coupled to exactly one chip 180 and conductor 114 is electrically coupled to exactly one chip 280, a convenient implementation of individual signal coupling.

Also relating to FIG. 7, the upper surface of the heat sink 780 is desirably coated with a dielectric coating to avoid electrically coupling with conductors 168 on the routing layers 980 between the chips 160,260. Materials usable for heat sinks 780 are known in the art, but most are electrically conductive. Alternatively, a spacing layer 880 thick enough to allow clearance below the routing layer 980 (as shown) can be employed in conjunction with a heat sink 780 affixed away from the routing layer 980.

FIG. 8 shows a cross-sectional view of the stacked device 582 of FIG. 7. Conductors 168 on the underside of the routing board 980 are electrically separated from the heat sink 780 by a dielectric 195 between the board 980 and the heat sink. If the heat sink is affixed to the bottom chip 180, the dielectric 195 may be an air gap. Otherwise, the dielectric 195 can comprise a coating on a surface of either the heat sink or the board 980. In a planar configuration having externally identical packages, as shown, the spacing segments 584 preferably have a greater thickness 881 than that of one chip 180 plus that of one heat sink 780. As shown in FIGS. 7 & 8, each spacing segment 584 lacks horizontal trace routing has a thickness 881 at least about as large as its width 882.

In another embodiment like that shown in FIG. 8, the body of the lower chip 180 extends lower than the bottom of the leads 179. A primary board can accommodate such chips by providing a recessed portion large enough to admit the body of the lower chip, and is advantageous for accommodating flat package leads, for example (see FIG. 11).

FIG. 9 shows a cross-sectional view of stacked device 583 comprising an upper chip 280 having package leads 279 that are longer than the leads 179 of the lower chip 180. Conductors of the upper package 280 comprise leads 279 each having an upper side 268 and a lower side 267. As shown, a portion of the lower side of each lead is a lower external contact 191,291. Variations in the configurations of external leads are well known in the art. In lieu of a routing or spacing layer in the configuration of FIG. 9, upper external contacts 291 of the elongated leads 279 couple directly to an upper external contact 192 of a conductor of the lower package 180. To accommodate larger chips having higher currents (and/or leads on four sides) a larger heat sink 780 is shown. Different lead configurations for internally identical packages are optionally used to some advantage in conjunction with embodiments shown in FIGS. 5–8 & 12–20.

FIG. 10 shows a stacking configuration differing from that shown in FIG. 7 in three important features. First, interface 199 comprises a single piece routing layer 980 that also provides spacing between each lower conductor 101–118 and a respective upper conductor 201–218. The routing layer has at least one recessed portion 994 into which at least one chip 180 protrudes. The recessed portion 994 can be bathtub-shaped for a chip 180 having terminals on four sides. Second, each layer of chips 180,280 comprises a plurality of chips. This is a valuable space-saving feature not compatible with some chip stacking systems. Third, the depicted routing layer 980 includes a widened portion 996 wide enough to permit traces 968 that extend outside the footprint of any of the stacked chips 180,280 with at most a minor increase in stacked device footprint size (i.e. less than about 5%). As shown, this widened portion 996 allows at

9

10

least one trace 969 to be relocated to an outer portion of the layer 980 (i.e., outside the nearest chip's footprint). This, in turn, allows an upper-surface trace 968 to be used in lieu of each lower-surface trace 168 of FIG. 7, removing the necessity for an insulator between the routing layer 980 and the heat sink 780. With minor modifications at most, one of ordinary skill could adapt any of these three features for use with embodiments shown in any of FIGS. 5–7 or 10–13 as described herein.

FIG. 11 shows a partially exploded view of a stacked device comprising three chips 180,280,380 and two interfaces 199,299 each comprising a frame-shaped spacing layer 880 fully populated with vertical conductors (not shown). The spacing layer 880 of the upper interface comprises assembly tabs 888 having tapered ends 889. Spacing layers are preferably manufactured in sheets comprising many individual layers 880 joined at their tapered ends, and having reflow paste screen printed to each contact prior to stack assembly. Many bottom chips 180 can be arranged into a grid by robotic assembly equipment, each in a recessed portion 82 of a work surface such that of as a reflow pallet 81. During reflow, the stack is desirably secured and compressed by a downward force applied by a flanged plunger 85 or the like. After reflow, the stacked devices can be singulated by breaking the spacing layers at their tapered ends.

FIG. 12 shows a detailed example of a stacked device mounted on a primary board 502 according to the present invention. In this embodiment, IC dies are packaged in "leadless" chip carrier (LCC) packages 160,260, so named because their conductors 101–158,182,191,192 do not protrude significantly outside the basic shape of the body of the package. In FIG. 12, the bottom LCC package 160 is tilted downward so that its side 172 is visible. A higher, stacked LCC package 1160 is tilted upward so that its bottom side 1171 is visible, as are half of the 58 external lines 198 (lines "external" to the package, half of which are shown schematically).

In FIG. 12, interface 199 may simply comprise solder between conductor 101 and conductor 1101 and between each of the other 57 matched pairs of conductors of the two lower packages. Optionally, it may include spacing layers and/or heat sinks such as those shown in FIG. 7. Optionally, the present invention includes a second stacked package 2160 identical to the lower packages 160,1160 having 58 open contacts on its top surface 2172. The bottom LCC package 160 contains a die having internal circuitry 100 coupled by several internal lines 197 to respective upper contacts 192 on the package's upper surface 172 and to respective lower contacts 191 on the package's lower surface 171. Each of these internal lines 197 comprises an external contact 181 of the first die and an internal contact 182 of the package, as well as the two external contacts 191,192 of the lower external. At least half of the lower external contacts 191 each couple directly to a corresponding contact 592 on the primary board 502. As explained below, however, a small number of lower external contacts 191 of the bottom LCC are optionally unconnected, such as by being physically coupled to a dielectric 590 on the primary board 502. Examples are shown below conductors 130,146 & 150. As shown at conductors 146 and 1146 of the present invention, stacking structures of the present invention optionally feature one ore more couplings between chip conductors having very low capacative loads by virtue of being electrically isolated from the interior of the board 502 upon which the stacked device is mounted.

Preferably, each package 160,1160 contains at least one unconnected contact 189,1189 outside the internal circuitry

100,1100 of dies inside the package. In a typical case, as explicitly shown for package 1160, either a package conductor 1134 or an internal circuit line 1186 will be electrically coupled to one side of each unconnected contact 1189. Unconnected contacts 189,1189 may be a part of the die (such as a bonding pad to which no bond wire is attached) or a part of the package (such as a bond finger to which no bond wire is attached). As explained below, appropriate use of unconnected contacts allows performance enhancements and ease of manufacture not previously available.

It should be understood that many contacts 181,182,189 inside the package 160 are not shown in FIG. 12, nor are conductors that may couple an unconnected contact 189 electrically to either external contacts 191,192 or to internal circuitry 100. Unconnected contacts 189,1189 and the conductors to which they are attached are commonly called "no-connects" in the art.

Although some of the die contacts 181 may be unconnected contacts 189,289, most of the external die contacts 181 (i.e., available on the exterior of the die) in each package 160 are typically coupled electrically to both the corresponding internal circuitry 100 and to a corresponding package contact 182. In some circumstances, it is advantageous to have one or more internal lines 1185 each coupled electrically to two or more package contacts 1116,1117.

FIG. 13 shows a Venn diagram for ascertaining a suitable package size for a given set of chips to be stacked, especially useful for less-similar chips. Circles 160,1160 each represent a package and each "x" in a circle represents a conductor extending within a corresponding package. Zone 21 thus contains the conductors that extend into both packages 160,1160. Recalling that fourteen internally connected package conductors 101,108,111,114,117,118,119,125,130,133, 138,146,150,152 are each coupled to a corresponding internally connected package conductor in FIG. 12, these fourteen couplings are each shown as an "x" in intersection zone 21. Similarly, thirteen other conductors coupled to chip 160 but not to chip 1160 are each shown as an "x" in zone 11. A careful review of either FIG. 12 or 13 will thus show that a total of twenty-seven package conductors of chip 160 are internally connected (to internal circuitry 100 within chip 160). As explained above, some aspects of the present invention are directed to individual signal coupling—changing the connectivity of chips 160,1160 initially having "exclusive" zones 11 and 22 empty.

FIG. 14 shows a Venn diagram like that of FIG. 13 adapted for coupling more than two layers. As shown, FIG. 14 is adapted to show how a stack of three dissimilar chips 160,1160,2160 can be configured in a substantially non-parallel configuration consistent with FIG. 12. As shown, the third circle 2000 represents a top chip 2160. Ten conductors in zone 44 are shared by all three chips, and the zone 21 shared by only the lower chips 160,1160 (excluding the third chip 2160) has only four "composite" conductors. In general, each circle 160,1160,2000 represents either a die or another layer having selectively provided coplanar contacts such as a substrate 502.

FIG. 15 shows a stacked device of the present invention somewhat similar to that of FIG. 12, teaching a chip differentiating approach. Techniques are known for detecting any of the post-fabrication induced chip differences taught herein. With the aid of these teachings, it is merely a matter of design choice for one of ordinary skill to provide suitable internal circuitry responsive to any of these differences. IC die 100 includes a storage cell 190, which can be any of the nonvolatile storage devices known in the art such as a

US 6,849,480 B1

11

laser-modified element. More preferably, cell 190 comprises an EEPROM or other read-only memory cell or a fusible link. It can also be one or more light-sensitive components on the IC die used in conjunction with a clear IC package cover.

As depicted, die 1100 and package 1160 are substantially identical to die 100 and 160, respectively. In one embodiment, the depicted stacked device can function because the storage cells 190,1190 are configured differently. In another, an unconnected contacts 189,1189 present in one chip is absent in each other chip in the stack.

FIG. 16 shows an inventive configuration of unconnected contacts 189,289 for individual signal coupling to each chip of a 2-layer stacked device (i.e. one having two layers of chips). It is substantially consistent with FIG. 15 as explained above, but depicts external contacts 191,192 set back from the sides 163 of the packages 160,260. Integrated circuit die 170 having internal circuitry 100 is mounted inside bottom IC package 160. Within the bottom package 160, internal lines 197 each comprises couplings between external contacts 191,192 and internal contacts 182 of the package 160, bond wires 183, contacts 181 on the die 170, and a portion of a signal trace leading into the internal circuitry 100. It can be seen in FIG. 16 that an unconnected contact 189 within the bottom package 160 is electrically coupled to internal circuitry 100, but is otherwise separate from any external contacts 191,192 by a large dielectric gap.

Substantially identical integrated circuit dice 270 is similarly mounted inside substantially identical IC package 260, but is connected with a different bond wire configuration. In particular, the unconnected contact 289 on the upper die 270 is not directly above unconnected contact 189 of the identical lower die. Preferably, the two dice 170,270 are identical and are assembled in identical stacked packages 160,260, one die having first and second successive contacts 181 corresponding to identical successive contacts 281 on the other die, one package 160 having an internal contact of conductor 142 coupled to a first contact of the first die, the other package 260 having a corresponding internal contact of conductor 242 coupled to the second contact of the second die. In other words, each of the identical dice 170,270 desirably has an unconnected contact 189,289 that is offset from (i.e., does not correspond to) the unconnected contact 289,189 of the other chip. In a more preferred embodiment, successive contacts 181,281 of two identical dice 170,270 are coupled together through an inverter 541,542 in the internal circuitry of each die.

FIG. 17 shows another inventive configuration of unconnected contacts 189,289 for differentiating the chips of a stacked device, substantially consistent with FIG. 15 as explained above. In FIG. 17, the chip interface 199 comprises a spacing layer 880, which allows air flow and/or heat sink structures between packages 160,260. The depicted spacing layer 880 comprises vertical conductors 893 coupling upper contacts 892 each to a lower contact 891. At least some lower contacts 291 of the upper package 260 couple directly to upper contacts 892 of the spacing layer 880. At least one is unconnected, though, directly coupling only to a dielectric region 890 of the spacer 880. As shown, lower contacts 191 of at least some package conductors 110,112 are similarly configured for direct coupling with a primary board 502.

FIG. 17 also shows fusible links 186,187,286,287 which are blown so that each die 170,270 has a different configuration of fused links. In a preferred method of the present invention, all of the identically fabricated IC dice are pack-

12

aged and electrically coupled identically prior to blowing the links. This facilitates production by reducing the variety of components that must be maintained in inventory, delaying the time at which differences between the upper and lower packaged devices are created. If all-or-nothing links are used, the two shown links can be blown in any of four configurations. Each die has at least one configuration conductor such as a fusible link 186,286 of FIG. 17. At least $\log_2$ L configuration conductors are used, where L is the number of layers in the stack. In FIG. 17, it may be regarded that some package terminals 112,212 have extra links 187, 287 coupled to them, individual signal coupling being achievable with only $\log_2$ 2=one fusible link 186,286 on each die, for a two-layer stack. One embodiment of the present invention thus omits the extra link 187,287 on each die. It is advantageous to have such extra links, however, as the identical dice 170,270 can be packaged and maintained in an inventory without deciding whether they are to be used in stacks of 2, 3, or 4 layers until the stacked device is about to be assembled.

FIG. 18 shows a flowchart of a method of the present invention compatible with FIG. 17. Chips to be stacked are built 1820 with a nonvolatile configuration element. This can be a cell 190 as discussed above with reference to FIG. 15, a fusible link 186 as explained above with reference to FIG. 17, or a similar item known in the art. Preferably, the selected element is of a type that is readily modified without mechanical operations such as bending, soldering, or cutting. Many nonvolatile elements responsive to solid state programming methods are available, as already discussed.

The internal chip characteristics are modified 1830 and the stacked device is assembled 1840 as described above. In one embodiment, package conductors having a side contact (such those depicted in FIGS. 7–12) in a stack of more than three layers of substantially identical chips.

Referring back to FIG. 17, a programming conductor 111,211 for each of the packages 160,260 is shown. A preferred embodiment of the present invention provides side contacts for programming conductors (the construction of such side contacts being shown in the art). Side contacts can be used in lieu of top or bottom contacts to provide access to a programming line on only one package at a time, or with a spacing layer having a dielectric zone 890 such as that of FIG. 17. For a stack of several layers of substantially identical chips, modifying step 1830 of FIG. 18 preferably comprises differentiating the chips in each vertically aligned set using such programming conductors.

In another embodiment, three identical chips are stacked with spacing layers exactly consistently with FIG. 17 (the second spacer layer and third stacked chip not shown). A stacked device of this embodiment is desirably stacked (assembled) 1840 before the internal chip characteristics are modified 1830. Advantageously, this removes the necessity of tracking which chip is which until after the stacks are assembled. The bottom die 170 is differentiated from the others 270,370 by providing a large current between conductors 110 & 111, thus blowing link 186. The top die 370 is differentiated from the others 170,270 by blowing a link coupled to package conductor 312. After at least part of the chip differentiation 1830 and the assembly 1840, the stacked device is ready to be installed 1850 onto a substrate.

FIG. 19 shows another flowchart of the present invention compatible with FIGS. 15, 16 & 20. Dies are mounted into packages 1920 without being differentiated, thus taking partial advantage of the principle of commonality. A first conduit configuration is used for installing conduits into the

**13**

first package **1930** to couple the necessary contacts of the first die. For installing conduits into the second package **1940**, a second conduit configuration different from the first is used, thus differentiating the chips. After these installations, the IC chips are stacked **1950**.

FIG. 20 shows several unconnected contacts **189,289,389** in a configuration of the present invention compatible with FIG. **19** as described above, in a 3-layer stack. Integrated circuit dice **170,270,370** are packaged inside respective integrated circuit packages **160,260,360**. Upper external contacts **392** of the topmost chip **380** are all physically separated from one another by dielectric gaps **396** and a complete dielectric cover **395** such as air or a deposited coating **585** like that shown in FIGS. 4 & 5. Upper external contacts **192,292** of lower chips **180,280** are likewise separated by dielectric gaps **196,296**, but have external lines **198,298** displacing at least part of any corresponding dielectric covering.

All of the steps and structures described above will be understood to one of ordinary skill in the art, and would enable the practice of the present invention without undue experimentation. It is to be understood that even though numerous characteristics and advantages of various embodiments of the present invention have been set forth in the foregoing description, together with details of the structure and function of various embodiments of the invention, this disclosure is illustrative only. Changes may be made in the details, especially in matters of structure and arrangement of parts within the principles of the present invention to the full extent indicated by the broad general meaning of the terms in which the appended claims are expressed. For example, the particular elements may vary depending on the particular application for the present system while maintaining substantially the same functionality, without departing from the scope and spirit of the present invention. In addition, although the preferred embodiments described herein are largely directed to increasing the areal density of PCB's and the simplifying the manufacture of components for stacked devices, it will be appreciated by those skilled in the art that the teachings of the present invention can be applied to improve other performance aspects without departing from the scope and spirit of the present invention.

To summarize a method of the present invention, a layer of chip(s) **280,380** is placed directly on the floor **81,82,83** of an assembly fixture. A spacing and/or routing layer **584,880** is placed directly on the contacts **291,292** of the chip(s), and an additional layer of chip(s) **180,280** is placed directly on the layer **584,880**. After bonding the layers such as by solder reflow **1265**, the stacked device **580** made by the method is optionally tested **1270** before removal from the fixture.

Another method comprises mounting dies **170,270** (which may be similar or identical) into packages **160,260** (which may also be similar or identical). The chips **180,280** made by this method are differentiated either by installing a different configuration of conduits **1940** (e.g. bond wires **183** and no-connects **189**) into each or by otherwise modifying their electrical characteristics **1830** (such as by blowing a link **186** or by programming a cell **190**). Installing steps **1930,1940** may differ by simply moving one no-connect **189** horizontally offset from another **289**.

In another method, a substrate **503** is built having many conductive contacts **592** and many internal traces **568**. A stacked device **580,582** is assembled with several substantially coplanar conductive contacts **191**. Some of the device contacts **191** are physically coupled to contacts **592** on the substrate, but at least one of the device contacts **191** is

**14**

electrically isolated from all of the internal traces **568**, such as by providing a dielectric region **590** coplanar with the substrate contacts **592** and aligned with at least one device contact **191**.

Devices made by each of these methods or having this recited structure are also embodiments of the present invention. One such device includes top and bottom rectangular packages **160,260** each having gull-wing leads protruding outward and downward from at least two sides. A means for physically coupling the leads is provided as taught above, optionally comprising two elongated printed circuit board (PCB) segments **584** between the leads of the top and bottom packages. A means for electrically coupling the leads is likewise taught, optionally including one or more horizontal circuit traces within the PCB segments **584**.

What is claimed is:

1. A method of stacking chips by positioning at least two chip layers into an assembly fixture comprising a floor, each layer comprising at least one chip, the method comprising steps of:

   (a) positioning a first chip layer directly on the floor;

   (b) positioning a first spacer layer on the first chip layer;

   (c) positioning at least one additional chip layer over the spacer layer;

   (d) coupling the layers together; and

   (e) removing the coupled layers from the assembly fixture, the coupled layers comprising at least one stacked device.

2. A stacked device made by the method of claim 1.

3. The method of claim 1, in which at least one of the chip layers comprises a package, and at least one of the chips is mounted within the package.

4. The method of claim 1, in which the first spacer layer is generally rigid.

5. A method of stacking similar, packaged first and second dies comprising steps of:

   (a) mounting at least one of the first dies into a first package;

   (b) installing several electrical conduits into the first package in a first conduit configuration;

   (c) mounting at least one of the second dies into a second package;

   (d) installing several electrical conduits into the second package in a second conduit configuration different from the first configuration; and

   (e) electrically coupling the first package to the second package to form a stacked device.

6. The method of claim 5 in which only one of the first dies is stacked with only one of the second dies, the first and second dies being substantially identical, each die having internal circuitry and a set of a nominal contact locations relative to the circuitry, the first set of nominal locations containing the second set of nominal locations; in which each package has an interior, each interior and each die including several contacts; in which each of the conduits is a bond wire coupling one of the die contacts to one of the interior contacts; in which installing steps (b) and (d) each comprise a step of coupling several bond wires each directly to one of the die contacts and to one of the interior contacts; in which installing step (b) results in a first set of contacts being electrically coupled that define the first conduit configuration; and installing step (d) results in a second set of contacts being electrically coupled that define the second conduit configuration.

US 6,849,480 B1

15

**7.** A stacked device made by the method of claim **5**.

**8.** The method of claim **5** in which mounting step (c) is completed before the installing step (d) is completed.

**9.** The method of claim **5** in which at least one of the electrical conduits comprise a bond wire.

**10.** The method of claim **5** in which coupling step (e) further comprises a step of:

(e1) electrically coupling the electrical conduits in the first package with the electrical conduits in the second package.

**11.** A method of making a stacked device comprising at least a first integrated circuit (IC) die and a second IC die, comprising steps of:

(a) building a first IC chip by installing the first die in a first package;

16

(b) building a second IC chip by installing the second die in a second package, the second die being identical to the first die, the second package being internally identical to the first package;

(c) sealing the packages;

(d) modifying the electrical characteristics of at least one of the chips; and

(e) electrically coupling the first chip to the second chip to form a stacked device.

**12.** The method of claim **11** in which the modifying step (d) comprises blowing at least one fusible link that resides on at least one of the dies.

**13.** The method of claim **11**, in which modifying step (d) is performed prior to coupling step (e).

*   *   *   *   *

US006336174B1

(12) **United States Patent**
Li et al.

(10) Patent No.: **US 6,336,174 B1**
(45) Date of Patent: **Jan. 1, 2002**

(54) **HARDWARE ASSISTED MEMORY BACKUP SYSTEM AND METHOD**

(75) Inventors: **Qiang Li**, Campbell; **Clifford E. Strang, Jr.; Jon F. Zahornacky**, both of San Jose, all of CA (US)

(73) Assignee: **Maxtor Corporation**, Longmont, CO (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/370,855**

(22) Filed: **Aug. 9, 1999**

(51) Int. Cl.[7] ................................................ G06F 12/00
(52) U.S. Cl. ............................ 711/162; 711/161; 714/6; 365/228
(58) Field of Search ................................. 711/162, 160, 711/161; 714/6–22; 710/10; 713/340; 370/537; 365/228, 229

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,072,852 A | * | 2/1978 | Hogan et al. | 714/15 |
| 4,815,074 A | * | 3/1989 | Jacobsen | 370/537 |
| 4,959,774 A | * | 9/1990 | Davis | 714/6 |
| 5,283,792 A | | 2/1994 | Davies, Jr. et al. | 714/22 |
| 5,379,431 A | * | 1/1995 | Lemon et al. | 710/10 |
| 5,799,200 A | * | 8/1998 | Brant et al. | 713/340 |

OTHER PUBLICATIONS

nvSRAM Basics, Simtek 1999 Data Book, Chapter 8, pp. 8–1 to 8–5.

* cited by examiner

Primary Examiner—Do Hyun Yoo
Assistant Examiner—Nasser Moazzami
(74) Attorney, Agent, or Firm—David M. Sigmond

(57) **ABSTRACT**

A hardware assisted memory module (HAMM) is coupled to a conventional computer system. During normal operation of the computer system, the HAMM behaves like a conventional memory module. The HAMM, however, detects and responds to at least one of the following trigger events: 1) power failure, 2) operating system hang-up, or 3) unexpected system reset. Upon detection of a trigger event, the HAMM electronically isolates itself from the host computer system before copying digital information from volatile memory to nonvolatile memory. Once isolated, the HAMM takes its power from an auxiliary power supply. The HAMM can be configured to copy all or part of the digital information to nonvolatile memory. Upon either a request or at power-up, the HAMM copies the digital information from the nonvolatile memory into the volatile memory. If there is a normal computer shutdown, the operating system will first warn the HAMM before shutting down, thus precluding it from performing a backup operation. The operating system determines whether the last shutdown was unexpected by reading a register stored in a reserved area of memory. If the operating system wants the digital information restored, it orders the HAMM to restore the backed-up digital information from nonvolatile memory to volatile memory.

**80 Claims, 5 Drawing Sheets**





FIGURE 1



FIGURE 2



**FIGURE 3**



**FIGURE 4**



**FIGURE 5**

US 6,336,174 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# HARDWARE ASSISTED MEMORY BACKUP SYSTEM AND METHOD

## FIELD OF THE INVENTION

The invention relates to memory backup and restoration of digital information, and more particularly, to a hardware assisted memory backup system and method using nonvolatile memory.

## BACKGROUND OF THE INVENTION

The need for emerging file server technology with multi-protocol file system semantics has created unique problems in data management for file service operations, such as saving data to disk storage in real-time and reliably. These problems are further exacerbated by the potential of catastrophic system failures, such as operating system (O/S) hang-up, and/or unexpected power failures and system resets. For some applications, the loss of certain types of data may not pose any serious problems. For client/server applications, however, if the system loses "meta" data, i.e., information concerning a system's file structure, the file structure will be difficult, if not impossible, to reconstruct.

In a typical client/server application, a client computer can request a server computer to store file system data to a permanent storage device, such as a hard disk. Because a typical write transaction can take several operations to complete, the client data is temporarily stored in server memory until the write transaction is successfully completed. Once the data is safely stored to disk, the server computer can inform the client computer that the write transaction was completed. This entire store transaction can take as long as 20 milliseconds, which is a long delay for the client.

Unfortunately, if a catastrophic event occurs while all or some of the data is still in system memory, data loss can occur. Data loss occurs because the server system memory typically is volatile memory, such as Dynamic Random Access Memory (DRAM) or Static Random Access Memory (SRAM). For example, DRAM employs a system of transistors and capacitors to retain data. Because the capacitors cannot maintain an electrical charge indefinitely, the capacitors must be continuously refreshed by a power supply. Thus, backing-up data stored in DRAM in the event of a power failure presents the additional problem of refreshing DRAM until all data has been safely transferred to nonvolatile memory.

Some conventional systems automatically transfer data from volatile memory (e.g., SRAM) to nonvolatile memory (e.g., Electrical Erasable Programmable Read-only Memory (EEPROM), if the chip power drops below a first predetermined voltage (e.g., 4.2 volts from 5 volts). If the chip power drops below the first predetermined voltage, a store operation is started that continues until the chip power drops below a second predetermined voltage (e.g., 3.5 volts), after which time the integrity of the data being transferred from volatile memory becomes uncertain. Thus, the store operation must complete before the chip power drops below the second predetermined voltage.

The conventional systems described above provide a solution for systems requiring a limited amount of data transfer, such as 32K. Unfortunately, the amount of data that can be safely transferred by these systems is limited by the finite interval of time where the chip power is sufficiently high to ensure a successful data transfer. Unfortunately, for systems requiring a larger data transfer, such as 8 Mb or more, these conventional systems do not provide a solution.

Moreover, these systems typically cannot operate with DRAM because they do not provide a refresh engine that can operate during power failure events. As discussed above, a refresh engine, or its equivalent, is necessary in DRAM based systems to maintain data stored in volatile memory while such data is being backed-up to nonvolatile memory.

An additional problem with some conventional systems is their inability to provide memory backup in response to events other than power failure events, such as unexpected system resets or O/S hang-up. The conventional systems are unable to differentiate between normal system shutdowns and unexpected system shutdowns initiated by, for example, a user pressing a hardware reset button. The inability to differentiate between normal and unexpected system shutdowns can decrease the life of the nonvolatile memory employed in such systems because of the finite number of write cycles available in such memories. The ability to prolong the "write" life of nonvolatile memory is important when one considers that a typical EEPROM cell or flash memory cell can break down after a finite number of write cycles.

Still another problem with conventional systems and methods is how such systems and methods store O/S kernel code for rebooting the system after a catastrophic failure. In conventional embedded systems, O/S kernel code is usually stored in specialized nonvolatile memory, which requires additional memory mapping, and modification of BIOS to load and initialize the kernel. Storing O/S kernel code in specialized nonvolatile memory typically increases the number of system components, increases BIOS development and maintenance efforts, and reduces system boot speed.

Accordingly, there remains a need for a memory backup system and method that copies digital information from volatile memory to nonvolatile memory in response to catastrophic events, such as O/S hang-up and unexpected power failures and system resets. The system and method should be able to quickly copy a relatively large amount of information (e.g., 8 Mb or greater) from volatile memory (e.g., DRAM) to nonvolatile memory without corrupting the integrity of the information. Moreover, the system and method should be able to differentiate between normal system shutdown events and unexpected shutdown events to preserve the "write" life of the nonvolatile memory. The system and method should also use conventional memory chip formats and packaging, such as Dual In-line Memory Module (DIMM) or Single In-line Memory Module (SIMM). These conventional package formats can enable the system to easily couple with the system memory bus of a conventional computer system, such as a Personal Computer (PC).

Additionally, there is a need for storing O/S kernel code into main system memory to reduce the number of system components, reduce BIOS development and maintenance efforts, and improve system boot speed.

## SUMMARY OF THE INVENTION

The present invention is directed to a hardware assisted memory module (HAMM) for communicating digital information between volatile and nonvolatile memory in response to a trigger event from, for example, a host computer system. The HAMM generally includes a volatile memory coupled to an information source for receiving and storing information; a nonvolatile memory coupled to the volatile memory for receiving and storing information communicated from the volatile memory; and a controller coupled to the memories for controlling the communication

US 6,336,174 B1

3

of information between the memories in response to the trigger event. The controller can determine the type of the trigger event from, for example, control information stored in the volatile memory.

In a preferred embodiment of the present invention, the HAMM is coupled to a host computer system, such as a PC. During normal operation of the computer system, the HAMM behaves like a conventional memory module, for example, storing digital information received from a data bus. The HAMM, however, detects and responds with a memory backup operation to at least one of the following events: 1) unexpected power failure, 2) operating system hang-up, or 3) unexpected system reset. Upon detection of an event, the HAMM electronically isolates itself from the host computer system before copying the digital information from volatile memory to nonvolatile memory. Once isolated the HAMM takes its power from an auxiliary power supply, such as a battery.

The HAMM can be configured to copy all or part of the digital information to nonvolatile memory. Upon either a request or at power-up, the HAMM copies the digital information from nonvolatile memory into volatile memory. If there is a normal or expected computer shutdown, the O/S warns the HAMM before shutting down the host computer system, thereby precluding the HAMM from performing the memory backup operation. The O/S determines whether the previous shutdown, if any, was unexpected by reading a control register in a reserved area of volatile memory, preferably outside the memory map of the volatile memory. If the O/S wants the file information restored, it orders the HAMM to restore the backed-up file information from nonvolatile memory to volatile memory.

The present invention is also directed to a memory backup system. The system is coupled to a host computer system for providing memory backup in response to a trigger event. The system includes a volatile memory coupled to an information source for receiving and storing information; a nonvolatile memory coupled to the volatile memory for receiving and storing information communicated from the volatile memory; and a controller coupled to the memories for controlling the communication of information between the memories in response to the trigger event. The controller determines the type of the trigger event from control information stored in the volatile memory.

The present invention is also directed to a memory backup method. The method includes the steps of: detecting a trigger event from a host computer system; determining if the trigger event is an unexpected host computer system failure or a normal host computer system shutdown by examining a data structure in volatile memory; copying digital information from volatile memory to nonvolatile memory only if the type of the trigger event is an unexpected host computer system failure; and storing control information relating to the type of the trigger event in volatile memory.

An advantage of the present invention can be best realized in a client/server application, where memory access time is reduced during write transactions. Because the HAMM provides assurance that data will be backed-up in the event of a catastrophic failure, a file server system can complete a transaction with a client even though all or part of the data to be transferred is still in volatile memory in the file server system. By completing the write transaction early, the overall transaction time is reduced. This time savings, multiplied by the number of write transactions that take place in a typical client/server application, can be significant.

4

Another advantage of the present invention described above, is the ability of the HAMM to copy large amounts of data (e.g., 8 Mb or larger) from volatile memory to nonvolatile memory. By using an auxiliary power supply, the volatile memory can be safely maintained until the data is copied. By contrast, some conventional systems must copy the data within the time interval just before the chip power drops below a predetermined voltage. Thus, these conventional systems can transfer only small amounts of data (e.g., 32K).

An advantage of using the auxiliary power supply as described above, is the ability to use different types of volatile memory, particularly memory that requires refresh, such as DRAM. The auxiliary power supply can be used to refresh the DRAM while data is being copied during unexpected system power failure.

An advantage of using isolation devices as described above, is the ability to isolate the HAMM from the host system's power supply during control operations to prevent spurious events (e.g., power spikes, short circuits) from corrupting the data while performing control operations.

Another advantage of the present invention is the added flexibility of responding to multiple triggering events, rather than just system power failures. This advantage is important because other events, such as O/S hang-up and unexpected system resets, can also cause data loss. Conventional systems that protect only against system power failures do no provide adequate data protection for many applications.

Still another advantage of the present invention is the ability to permanently store a pre-initialized O/S kernel image in nonvolatile memory, and to quickly copy it into system memory using control logic disposed in the HAMM. From an O/S point of view, this is equivalent to permanently storing an O/S kernel in volatile system memory. Most conventional systems cannot provide this function cost-effectively. Thus, the present invention provides an important advantage over conventional embedded systems, and thin file systems in particular, by simplifying both the hardware and software used to store and retrieve the O/S kernel code, thereby increasing system boot speed.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention has other advantages and features which will be more readily apparent from the following detailed description of the invention and the appended claims, when taken in conjunction with the accompanying drawings, in which:

FIG. 1 is a functional block diagram of one embodiment of a file server system 100 in accordance with the present invention;

FIG. 2 is a functional block diagram of one embodiment of a hardware assisted memory module in accordance with the present invention;

FIG. 3 is a flow diagram of one embodiment of control logic illustrating event detection and store operations provided by the hardware assisted memory module in accordance with the present invention;

FIG. 4 is a flow diagram of one embodiment of control logic illustrating restore operations provided by the hardware assisted memory module in accordance with the present invention; and

FIG. 5 is a functional block diagram of one embodiment of the controller in FIG. 2 for executing the control logic in FIGS. 3 and 4.

DETAILED DESCRIPTION OF THE INVENTION

While the present invention is described with reference to a client/server application, other applications may be used

US 6,336,174 B1

5

with the present invention without departing from the spirit and scope of the present invention, for example, database engines, peer-to-peer networks, networks that employ distributed file systems, and standalone computers. The term "data," as used herein, includes all forms of digital information including file system data, otherwise known as "meta" data. Generally, the present invention is applicable to any applications that can benefit from staging data in high speed memory while maintaining data integrity upon system failure.

Referring to FIG. 1, there is shown a functional block diagram of one embodiment of file server system 100 (hereinafter also referred to as "host system 100") in accordance with the present invention. Host system 100 preferably includes a CPU 102, a hardware assisted memory module 104 (hereinafter also referred to as "HAMM 104"), a disk controller 106, a network interface 108, a system memory bus 110, an I/O bus 112, disk storage 114, and conventional memory 116. Host system 100 can be, for example, a conventional PC configured as a file server or, alternatively, a thin file server, such as the Plug & Stor™ 100 Thin Server, developed by Creative Design Solutions, Inc., Santa Clara, Calif.

CPU 102 can be a conventional computer processor, for example, a Pentium™ processor manufactured by Intel Corporation, Santa Clara, Calif. CPU 102 is coupled to system memory bus 110, which can be a conventional computer bus. System memory bus 110 is further coupled to I/O bus 112, which can be, for example, a Peripheral Component Interconnect (PCI) bus. The I/O bus 112 is coupled to network interface 108, which can be a conventional network interface (e.g., Ethernet) for providing bi-directional communication between host system 100 and one or more client computers. Coupled to I/O bus 112 is disk controller 106 for controlling the reading and writing of data to disk storage 114. Disk controller 106 can be a conventional hard disk controller, such as a Small Computer System Interface (SCSI) disk controller. Disk storage 114 is coupled to system memory bus 110 via disk controller 106. Disk storage 114 can be any conventional storage device used to store digital information, including, for example, hard disks and optical disk. Also shown in FIG. 1 is conventional memory 116, which is coupled to the system memory bus 110.

The HAMM 104 is a preferred embodiment of the present invention. The HAMM 104 is coupled to system memory bus 110 using conventional memory module formats, pin-outs, and/or packaging, for example, DIMM or SIMM. Preferably, the HAMM 104 replaces or supplements one or more conventional memory modules, and includes both volatile memory and nonvolatile memory. Multiple HAMMs can be coupled together as required by the system. The HAMM 104 is described in further detail below with respect to FIG. 2.

In accordance with the operation of host system 100, a client computer (not shown) communicates with host system 100 via network interface 108. Depending on the communication protocol (e.g., TCP/IP), if a client computer wants to store data in disk storage 114, the client computer sends a "write" request to host system 100. Upon acceptance of the client's "write" request, host system 100 receives data over the network and stores the data in volatile memory. Once the data is in volatile memory, host system 100 signals back to the client computer that the "write" transaction has been completed. The data remains stored in volatile memory until it can be safely stored to disk storage 114 via disk controller 106. If a catastrophic event occurs while all or some of the

6

data is still in volatile memory, the HAMM 104 copies all or some of the data to nonvolatile memory to prevent data loss, as described below with respect to FIG. 2.

An advantage of the present invention is that completion of a "write" transaction occurs while data is still in volatile memory, rather than waiting for the data to be actually stored to disk. By signaling to the client that the "write" transaction has completed even when data is still in volatile memory, the write transaction time can be significantly reduced. This advantage is made possible by the HAMM 104, which assures that data in volatile memory is safely copied to nonvolatile memory.

Referring to FIG. 2, there is shown a functional block diagram of one embodiment of the HAMM 104 in FIG. 1 in accordance with the present invention. The HAMM 104 preferably includes volatile memory 202, nonvolatile memory 204, controller 206, isolation devices 208, and reserved memory 210. In a preferred embodiment, the volatile memory 202 is DRAM and the nonvolatile memory 204 is flash memory. Flash memory is integrated circuit memory that does not need continuous power to retain stored data. It has a limited life span of, for example, 100,000 write cycles. Typical flash memory is erased in blocks of data rather than single bytes of data, thus reducing the erase and write cycle times necessary to store data in such memories. Flash has relatively low cost and can be configured to have a fairly large size.

The amount of volatile memory 202 and nonvolatile memory 204 required can vary based on the needs of the host system 100. In one embodiment, the ratio of volatile memory 202 to nonvolatile memory 204 can be 2:1. For example, the HAMM 104 can include 8 Mb×8 DRAM and 4 Mb×8 flash memory, thus establishing a 2:1 ratio between DRAM and flash memory. Thus, in this example only half of the data in DRAM can be copied to flash memory.

It is noted that the present invention is not limited to DRAM or flash memory, and other types of memory can be used without departing from the spirit or scope of the present invention. For example, volatile memory 202 can include SRAM, Fast Page Mode DRAM (FPM DRAM), Extended Data Out DRAM (EDO), Synchronous DRAM (SDRAM), Double-data Rate SDRAM (DDR SDRAM), Direct Rambus™ DRAM (RDRAM), SyncLink™ DRAM (SLDRAM), Video RAM (VRAM), and Window RAM (WRAM). Additionally, nonvolatile memory 204 can include EEPROM, flash memory, and solid state disk.

Volatile memory 202 is coupled to system memory bus 110 (FIG. 1) through data bus 212 and address/control bus 216 via isolation devices 208. The isolation devices 208 can be transistors configured as on/off switches using conventional Complimentary Metal-oxide Semiconductor (CMOS) technology. The isolation devices 208 electrically isolate the HAMM 104 from the host system 100 in response to certain trigger events. This allows the HAMM 104 to run independent of the host system 100 after a catastrophic failure, even if the power to the host system 100 is lost.

Controller 206 is coupled to volatile memory 202 via address/control bus 216 and data bus 212. Controller 206 is also coupled to nonvolatile memory 204 via data bus 212 and address/control bus 217. Buses 216, 217 include both address and control signals for addressing and controlling volatile and nonvolatile memories 202, 204, respectively. Generally, controller 206 includes control logic, a clock, a power interface (e.g., battery interface), and a timing device. The control logic is for generating the address and control signals on buses 216, 217 for accessing volatile memory 202

US 6,336,174 B1

7                                                                          8

and nonvolatile memory 204. The clock (e.g., a crystal oscillator), is used to time various control operations. The power interface provides a connection to the auxiliary power source, such as a battery. The interface can include conventional circuitry for recharging a battery. The timing device is, for example, a watchdog timer, for triggering operating system hang-up. A preferred embodiment of controller 206 is described in further detail below with respect to FIG. 5.

Controller 206 manages control operations for the HAMM 104 which include store and restore operations. The store operation copies data from volatile memory 202 to nonvolatile memory 204. The restore operation copies data from nonvolatile memory 204 to volatile memory 202. The store operation is only performed if there is catastrophic failure to preserve the life span of nonvolatile memory 202, for example, flash memory, which may have a finite write life of about, for example, 100,000 write cycles.

In a preferred embodiment of HAMM 104, a block of reserved memory 210 contains a control register 209 that is monitored by controller 206. The O/S communicates with controller 206 by writing to control register 209. For example, the O/S can reset the watchdog timer and inform the HAMM 104 of the status of a host system 100 shutdown by setting one or more bits in control register 209. To ensure that reserved memory 210 remains exclusive to communications between the O/S and controller 206, an access sequence can be employed that prevents accidental access to reserved memory 210. Thus, if a software application steps into the address range of reserved memory 210, the probability of falsely triggering a control operation is virtually zero. The programming of controller 206 will determine the address range of reserved memory 210.

During a store operation, controller 206 generates the appropriate addresses on bus 216 to enable the copying of data from volatile memory 202 to nonvolatile memory 204 via data bus 212. The type of addressing scheme employed by controller 206 depends on the type of memory used in the HAMM 104. For example, DRAM could require a Column Access Select (CAS) addressing scheme and flash memory could require a most significant bit addressing scheme. Both addressing schemes are well-known in the art. In a preferred embodiment, controller 206 can interpret non-standard addressing/control through bus 216 to enable the host system 100 to access reserved memory 210, as described in further detail below. In the preferred embodiment, controller 206 copies data from volatile memory 202 to nonvolatile memory 204 by controlling the address and control signals on buses 216, 217 of volatile memory 202 and nonvolatile memory 204, respectively, as shown in FIG. 2.

Store operations are executed by controller 206 for at least one of the following trigger events: 1) O/S hang-up, 2) unexpected system reset, or 3) unexpected power failure. Each of these trigger events are described, in turn, below. It is noted, however, that the present invention is not limited to the events described below, and other trigger events are possible without departing from the spirit and scope of the present invention.

O/S Hang-up

A trigger event occurs when the watchdog timer in the HAMM 104 times out. In response to this trigger event, controller 206 initiates a store operation to copy all or part of the data stored in volatile memory 202 to nonvolatile memory 204. In an embodiment that uses DRAM, controller 206 can also maintain refresh during store and restore operations. Preferably, the watchdog timer is reset by a "write" to one or more bits in control register 209.

Unexpected System Reset & System Power Failure

Generally, a power failure is "unexpected" if the HAMM 104 is not forewarned by the O/S of a normal shutdown. Controller 206 is coupled to an auxiliary power supply, such as a battery, which is used if an unexpected system power failure occurs. If the system power fails, isolation devices 208 will turn off and thereby electrically isolate the HAMM 104 from the host system 100. During this time, the HAMM 104 receives its power from the auxiliary power supply, which provides for safe copying of data from volatile memory 202 to nonvolatile memory 204. The auxiliary power supply can also be used to refresh DRAM to maintain data while waiting to be copied. The host system 100 should be properly shutdown by the O/S before replacing the auxiliary power supply. This will ensure that data is properly stored in the event of unexpected power failure.

If there is a normal or expected shutdown the O/S will warn the controller 206 so that the controller 206 does not perform a store operation after system power is terminated. Preferably, the O/S warns the controller 206 of a normal or expected shutdown by writing to the control register 209. The warning can be communicated by, for example, setting one or more bits to indicate a normal shutdown (e.g., setting a bit to "0"). The controller 206 can determine whether the last shutdown was in response to a catastrophic failure by reading one or more bits in control register 209. Preferably, the control register 209 is read by the controller 206 after a reset operation is completed by the Basic Input/Output System (BIOS), thereby enabling BIOS to run system diagnostics. If the O/S wants the data restored, the O/S writes to one or more bits in control register 209 to order the controller 206 to restore the data stored in nonvolatile memory 204. Preferably, the restore operation is the reverse of the store operation described above.

In another embodiment of the present invention, the HAMM 104 provides boot-time O/S kernel loading support. A pre-initialized kernel image is permanently stored in nonvolatile memory 204 of HAMM 104, as if it were copied from the volatile memory 202 by the store operation. During the system boot, the kernel image is copied into the volatile memory 202 using the restore operation described above. Thus, from a user's point of view, the kernel is permanently resident in the volatile memory 202.

The above method has several advantages over conventional methods that keep the kernel in some additional nonvolatile memory in a special range of memory locations. First, copying the kernel from nonvolatile memory into volatile memory requires significant software/firmware work which makes system porting from platform to platform difficult. With the present invention, the kernel is logically stored in a range of volatile memory, and no additional software/firmware is needed to load the kernel. Second, the system boot speed is increased since there is no software copying and the kernel is already partially initialized. This is important for appliance style systems where short initialization time after power-up is expected.

Referring to FIG. 3, there is shown a flow diagram of one embodiment of control logic illustrating event detection and store operations provided by the HAMM 104 in FIG. 2 in accordance with the present invention. During normal operation of the host system 100, the HAMM 104 waits 300 for a trigger event to occur. In the preferred embodiment, trigger events include operating system hang-up and/or unexpected power failure or system reset, as described above with respect to FIG. 2.

Unexpected power failures are detected by controller 206, which can be hardwired to the power of host system 100 for detecting voltage drops. Similarly, unexpected system reset

US 6,336,174 B1

9

events can be detected by controller **206** by monitoring, for example, a RESET signal coupled directly to the HAMM **104**. The RESET signal can be hardwired to a reset button on the host computer system.

O/S hang-ups can be detected by monitoring the watchdog timer in the HAMM **104**. The watchdog timer can be reset by the O/S through control register **209**. A reset bit can be used for this purpose.

The status stored **304** in control register **209** in reserved memory **210** is always "no fault," unless there is an abnormal shutdown, in which case the status indicates a faulty shutdown. Control register **209** is read by controller **206** to determine the status of the shutdown when the system reboots at a later time. After storing **304** the "faulty shutdown" status, the HAMM **104** turns off **306** the auxiliary power supply to volatile memory **202**, and waits **308** for the host system **100** to reinitialize.

If **310** the system power is on, HAMM **140** connects **312** volatile memory **202** to system memory bus **110** and turns on the auxiliary power supply to volatile memory **202**. In the preferred embodiment, the auxiliary power supply is a rechargeable battery. Thus, by leaving the battery on during normal system operation, the battery can be recharged by the system power.

After the auxiliary power supply is turned on, the BIOS performs **314** conventional diagnostics. Upon completion of the diagnostics, the stored status in reserved memory **210** is examined to determine the reason for the last shutdown. If **316** the status is "no fault," then the HAMM **104** waits **300** for the next trigger event, as previously described above. If the status is "fault," the last system shutdown was due to a system fault, and the HAMM **104** initiates a restore operation, as described with respect to FIG. 2.

An advantage of using the control register **209** and stored status described above, is the added flexibility in discriminating between normal shutdowns and unexpected system failures. Nonvolatile memory **204**, such as flash memory, has a finite write life (e.g., 100,000 write cycles). By not copying data from volatile memory **202** to nonvolatile memory **204** for normal shutdowns, the life span of the nonvolatile memory is increased. Preferably, control register **209** is in reserved memory **210**, which is outside the address map of volatile memory **202**. This reduces the probability of executing an erroneous control operation (e.g., store and restore operations) due to a software application stepping on the memory address of control register **209**. Additionally, a required access sequence to the address range corresponding to reserved memory **210** can be used to further eliminate the probability of executing an erroneous control operation.

If **318** a system fault occurs, such as a power failure, system reset, or a O/S hang-up, the HAMM **104** isolates **320** volatile memory **202** from system memory bus **110** by turning off isolation devices **208**. Preferably, isolation devices **208** comprise CMOS switches which are biased open during normal system operation. In the event of a system fault, the CMOS switches are biased close, thereby electrically isolating the HAMM **104** from the host system **100**. Upon the isolation of the HAMM **104**, the store operation begins. In the preferred embodiment, the store operation includes copying **322** data, address by address (e.g., 64 bits at a time), from volatile memory **202** to nonvolatile memory **204** using, for example, a CAS addressing scheme. Controller **206** controls the address and control signals for both volatile memory **202** and nonvolatile memory **204**. After the data stored at the current address is safely stored in nonvolatile memory **204**, the volatile memory address is incremented **324** until the transfer is complete. If **326** the transfer is complete, the HAMM **104**

10

turns off **306** the auxiliary power supply to memory, then waits **308** for the host system **100** to initialize, as previously described above.

It is noted that in practical applications it may be necessary to replace or reset the auxiliary power supply. In such cases, it is assumed that O/S properly shutdown the host system **100**. In the event that the auxiliary power supply is replaced or reset **330**, the HAMM **104** will wait **308** for the system to reinitialize, then proceed as previously described above.

Referring to FIG. 4, there is shown a flow diagram of one embodiment of control logic illustrating restore operations provided by the HAMM **104** in FIG. 2 in accordance with the present invention. If **316** a system fault is indicated by one or more bits in control register **209** being set (e.g., logic "1") , the HAMM **104** isolates **400** volatile memory **202** from the host system **100**, then begins a restore operation. The restore operation includes copying **402** data from nonvolatile memory **204** to volatile memory **202**. In a preferred embodiment, the restore operation is the reverse of the store operation, wherein data is copied address by address. If **404** the transfer is complete, volatile memory **202** is connected **408** to system memory bus **110**, the fault status is cleared **410** from the control register **209**, and the HAMM **104** waits **300** for the next trigger event. Otherwise, the current volatile memory address is incremented **406** to read out the next memory line (e.g., 64 bits of data).

An advantage of using the auxiliary power supply described above, is the ability of the HAMM **104** to copy large amounts of data (e.g., 8 Mb or larger) from volatile memory **202** to nonvolatile memory **204**. By using an auxiliary power supply, the volatile memory **202** can be safely maintained until the data is copied. By contrast, some conventional systems must copy the data within the time interval just before the chip power drops below a predetermined voltage. Thus, these conventional systems can only copy small amounts of data (e.g., 32K).

An additional advantage of using the auxiliary power supply as described above, is the ability to use different types of volatile memory, particularly memory that requires refresh, such as DRAM. The auxiliary power supply can be used to refresh the DRAM while data is being copied during unexpected system power failure.

An advantage of using isolation devices **208** described above, is the ability to isolate the HAMM **104** from the system power during control operations to is prevent spurious events (e.g., power spikes, short circuits) from corrupting the data while performing control operations.

Another advantage of the present invention is the added flexibility of responding to multiple triggering events, rather than just system power failures. This is important because other events, such as O/S hang-up and unexpected system resets, can also cause data loss. Conventional systems that protect only against system power failures do no provide adequate data protection for many applications.

Still another advantage of the present invention can best be realized in a client/server application where memory access time is reduced during write transactions. Because the HAMM **104** provides assurance that data will be backed-up in the event of a catastrophic failure, a file server system can complete a transaction with a client even though all or part of the data to be transferred is still in volatile memory in the file server system. By completing the write transaction early, the overall transaction time is reduced. This time savings, multiplied by the number of write transactions that take place in a typical client/server application, can be significant.

US 6,336,174 B1

11

Referring to FIG. 5, there is shown a functional block diagram of one embodiment of controller 206 in FIG. 2 for executing the control logic in FIGS. 3 and 4. The controller 206 includes a voltage monitor 500, a watchdog timer 502, a normal shutdown sequencer 504, an address counter 506, a micro sequencer 508, a system initial sequencer 510, a nonvolatile memory controller 512, a volatile memory controller 514, and a memory interface and control register 516. The controller 206 manages the store operation by executing the control logic that controls the address and control signals on buses 216, 217 to the volatile memory 202 and nonvolatile memory 204, respectively. The controller 206 generally functions as sets of state machines that, based on the input from the system, store and restore the volatile memory 202.

The O/S can shut down the host system 100 normally by writing to a control register 209 in the controller 206, which appears to the O/S to be part of the address space of the volatile memory 202. Other trigger events are handled by the controller 206 as described below.

Unexpected system resets or power failures are detected by the voltage monitor 500 which compares a reference battery and a system power supply, and provides a POWER FAULT signal in response to the system power supply falling below the reference battery. If a STOP FAULT signal from the normal shutdown sequencer 504 is not logic low (e.g., STOP FAULT="1"), a SYSTEM FAULT trigger event has occurred, thereby starting an isolation and store operation, as described with respect to FIG. 3.

The watchdog timer 502 is a free running counter which is periodically reset by the O/S writing to the control register 209. If the O/S becomes hung but is still able to reset the watchdog timer 502, the SYSTEM FAULT trigger event will not start the isolation and store operation. In that event, the voltage monitor 500 or the system reset is needed to safely store the information. The system reset is also used to start the isolation and store operation. It is subject to the STOP FAULT signal, which if not logic low will cause the SYSTEM FAULT trigger event that will start the isolation and store operation.

The normal shutdown sequencer 504 generates a STOP FAULT signal to keep the store operation from happening at every shutdown. The normal shutdown sequencer 504 performs a set of memory operations on the control register 209 in the controller 206. These operations can be as simple as setting a single bit. Some care should be taken to ensure that the memory operation does not cause the HAMM 104 to not execute the isolation and store operation when needed. This is achieved with a few write operations to the control resister 209 with a code that can be compared to a fixed value for determining if the O/S is performing a normal shutdown, thereby ensuring that the HAMM 104 does not execute the isolation and store operation. This prevents the HAMM 104 from accidentally stopping a SYSTEM FAULT operation.

The address counter 506 provides a local address for the store and restore operations. It is coupled to the memory controllers 512, 514, for addressing the memories 204, 202, respectively. The nonvolatile memory controller 512 is used for addressing and communicating with the nonvolatile memory 204 via bus 217. The nonvolatile memory controller 512 is also coupled to the micro sequencer 508, for receiving additional control signals for erasing the nonvolatile memory 204 to prepare for the next store operation. The volatile memory controller 514 is coupled to the volatile memory 202 via bus 216. For embodiments that use DRAM, the volatile memory controller 514 is also coupled to the micro sequencer 508 for controlling the refresh time for the volatile memory 202.

12

The micro sequencer 508 is the main control function for the HAMM 104. The micro sequencer 508 functions are described by the flow diagram in FIG. 3. It is important to note from FIG. 5 that the micro sequencer 508 controls the address counter 506, the nonvolatile memory controller 512, the volatile memory controller 514, and receives input from all other major blocks. After the SYSTEM FAULT trigger event is issued, the micro sequencer 508 isolates the HAMM 104 from the host system 100 and completes the store operation, including turning off power until the host system 100 is restarted. After the host system 100 is restarted, the micro sequencer 508 checks to see if the O/S wants the memory restored. If the O/S wants memory restored, the micro sequencer 508 isolates the HAMM 104 from the host system 100 and restores the volatile memory 202 before connecting the HAMM 104 back to the host system 100.

The system initial sequencer 510 is part of the startup operation for the HAMM 104. The BIOS must first complete its system checks before the micro sequencer 508 can restore the volatile memory 202. After that the O/S must signal the HAMM 104 that it can proceed and check if memory should be restored. Not all restore operations will occur after a power-off condition, but all restore operations will take place after the BIOS has rebooted the host system 100. The operation will be very similar to the normal shutdown sequence, except for the type of code used.

The memory interface and control register 516 is the read part of the memory interface and is used by the HAMM 104 to receive commands from the O/S. It decodes the address and control for normal memory cycles and stores part of the data for use on shutdown and initialization sequences.

Buses 216 and 212 are subsets of the total memory bus coupled to the HAMM 104. To reduce pin count on the controller 206, buses 216, 212 may contain less than all of the data signals.

Although the present invention has been described in considerable detail with reference to certain preferred embodiments thereof, other embodiments are possible. For example, the present invention is applicable to applications involving database engines, peer-to-peer networks, networks that employ distributed file systems, and standalone computers. Therefore, the spirit and scope of the appended claims should not be limited to the description of the preferred embodiments contained herein.

What is claimed is:

1. An apparatus coupled to a host computer system for communicating digital information between volatile and nonvolatile memory in response to a trigger event, the apparatus comprising:

a volatile memory coupled to an information source for receiving and storing the digital information;

a nonvolatile memory coupled to the volatile memory for receiving and storing the digital information communicated from the volatile memory; and

a controller coupled to the volatile memory and the nonvolatile memory for controlling the communication of the digital information between the volatile memory and the nonvolatile memory in response to the trigger event, the controller configured to determine the type of the trigger event from control information stored in the volatile memory.

2. The apparatus of claim 1, wherein the volatile memory is DRAM and the nonvolatile memory is flash memory.

3. The apparatus of claim 1, wherein the control information is stored in a portion of memory outside the memory map of the volatile memory.

4. The apparatus of claim 1, wherein the trigger event comprises at least one from the group of trigger events

US 6,336,174 B1

13
14

comprising: unexpected power failure, unexpected system reset, and operating system hang-up.

**5.** The apparatus of claim 1, further including

isolation devices for electrically isolating the volatile memory, nonvolatile memory and controller from the host computer system in response to the trigger event.

**6.** The apparatus of claim 5, wherein the isolation devices are CMOS devices.

**7.** The apparatus of claim 1, further including

an auxiliary power source for providing power to the apparatus in response to the trigger event.

**8.** The apparatus of claim 7, wherein the auxiliary power source is a battery.

**9.** The apparatus of claim 8, wherein the battery is recharged by the host computer system during normal operation.

**10.** The apparatus of claim 1, wherein the control information is provided by the operating system of the host computer system.

**11.** The apparatus of claim 1, wherein the apparatus couples to the host computer system through a conventional computer memory interface.

**12.** The apparatus of claim 1, wherein the volatile memory includes a control register for storing the control information.

**13.** The apparatus of claim 1, the controller further comprising:

a control circuit for generating address and control signals for accessing the volatile and nonvolatile memory;

a power interface circuit coupled to an auxiliary power supply for providing power to the apparatus in response to the trigger event; and

a timing device for determining if the host operating system of the host computer system has hung.

**14.** The apparatus of claim 13, wherein the timing device is reset by the control information stored in the volatile memory.

**15.** The apparatus of claim 13, further including a clock generator coupled to the control circuit for providing a clock to the control circuit.

**16.** The apparatus of claim 1, wherein an image of an operating system kernel is stored in the nonvolatile memory.

**17.** A memory backup system coupled to a host computer for providing memory backup in response to a trigger event, the system comprising:

a volatile memory coupled to an information source for receiving and storing the digital information;

a nonvolatile memory coupled to the volatile memory for receiving and storing the digital information communicated from the volatile memory;

a controller coupled to the volatile memory and the nonvolatile memory for controlling the communication of the digital information between the volatile memory and the nonvolatile memory in response to the trigger event, the controller configured to determine the type of the trigger event from control information stored in the volatile memory;

isolation devices for electrically isolating the system from the host computer in response to the trigger event; and

an auxiliary power source for providing power to the system in response to the trigger event.

**18.** The apparatus of claim 17, wherein the trigger event comprises at least one from a group of trigger events comprising: unexpected power failure, unexpected system reset, and operating system hang-up.

**19.** The system of claim 17, wherein the control information is provided by the operating system of the host computer.

**20.** The system of claim 17, wherein the volatile memory includes a control register for storing the control information.

**21.** The system of claim 17, wherein an image of an operating system kernel is stored in the nonvolatile memory.

**22.** A memory backup method using a hardware assisted memory module, comprising the steps of:

detecting a trigger event from a host computer system, the host computer system coupled to the hardware assisted memory module;

determining if the trigger event is an unexpected host computer system failure or a normal host computer system shutdown by examining a data structure in volatile memory;

copying digital information from volatile memory to nonvolatile memory if the type of the trigger event is an unexpected host computer system failure; and

storing control information relating to the type of the trigger event in volatile memory.

**23.** The method of claim 22, further including the steps of:

retrieving the stored control information from volatile memory;

determining from the control information the type of the trigger event; and

copying the digital information from nonvolatile memory to volatile memory if the type of the trigger event was an unexpected system failure.

**24.** The method of claim 22, further including the steps of:

electrically isolating the hardware assisted memory module from the host computer system; and

coupling the hardware assisted memory module to an auxiliary power source.

**25.** The method of claim 22, the detecting step including monitoring the host computer system for power failure.

**26.** The method of claim 22, the detecting step including monitoring the host computer system for a system reset.

**27.** The method of claim 22, detecting step including monitoring the host computer system for an operating system hang-up.

**28.** The method of claim 27, the monitoring step including the steps of:

setting a watchdog timer; and

performing the storing step if the watchdog timer exceeds a predetermined time limit.

**29.** The method of claim 22, the storing step further including the steps of:

providing a unique address sequence for accessing a portion of reserved volatile memory for storing the control information.

**30.** The method of claim 22, further including the step of:

copying an operating system kernel from nonvolatile memory to volatile memory.

**31.** A computer-readable medium in a hardware assisted memory module containing instructions thereon, which, when executed by a processor, perform the steps of:

detecting a trigger event from a host computer system, the host computer system coupled to the hardware assisted memory module;

determining if the trigger event is an unexpected host computer system failure or a normal host computer system shutdown by examining a data structure in volatile memory;

US 6,336,174 B1

15                                                    16

copying digital information from volatile memory to nonvolatile memory if the type of the trigger event is an unexpected host computer system failure; and

storing control information relating to the type of the trigger event in volatile memory.

**32.** The computer-readable medium of claim **31,** wherein the instructions further comprise:

retrieving the stored control information from volatile memory;

determining from the control information the type of the trigger event; and

copying digital information from nonvolatile memory to volatile memory if the type of the trigger event was an unexpected system failure.

**33.** The computer-readable medium of claim **31,** wherein the instructions further comprise:

electrically isolating the hardware assisted memory module from the host computer system; and

coupling the hardware assisted memory module to an auxiliary power source.

**34.** The computer-readable medium of claim **31,** wherein the instructions further comprise:

monitoring the host computer system for power failure.

**35.** The computer-readable medium of claim **31,** wherein the instructions further comprise:

monitoring the host computer system for a system reset.

**36.** The computer-readable medium of claim **31,** wherein the instructions further comprise:

monitoring the host computer system for an operating system hang-up.

**37.** The computer-readable medium of claim **31,** wherein the instructions further comprise:

setting a watchdog timer; and

performing the storing step if the watchdog timer exceeds a predetermined time limit.

**38.** The computer-readable medium of claim **31,** where the instructions further comprise:

providing a unique address sequence for accessing a portion of reserved volatile memory for storing the control information.

**39.** The computer-readable medium of claim **31,** wherein the instructions further comprise:

copying an operating system kernel from nonvolatile memory to volatile memory.

**40.** A computer-readable medium in a hardware assisted memory module containing instructions thereon, which, when executed by a processor, perform the steps of:

detecting a trigger event from a host computer system, the host computer system coupled to the hardware assisted memory module;

determining if the trigger event is an unexpected host computer system failure or a normal host computer system shutdown by examining a data structure in volatile memory;

storing control information relating to the type of the trigger event in volatile memory;

electrically isolating the hardware assisted memory module from the host computer system;

coupling the hardware assisted memory module to an auxiliary power source; and

copying digital information from volatile memory to nonvolatile memory if the type of the trigger event is an unexpected host computer system failure.

**41.** A memory backup system, comprising:

a volatile memory for receiving and storing digital information from an information source;

a nonvolatile memory for receiving and storing the digital information communicated from the volatile memory;

a control register for storing control information that indicates the nature and occurrence of a trigger event; and

a controller for transferring the digital information between the volatile memory and the nonvolatile memory in response to the control information indicating that the trigger event has occurred.

**42.** The system of claim **41,** wherein the trigger event is a power failure.

**43.** The system of claim **41,** wherein the trigger event is a system reset.

**44.** The system of claim **41,** wherein the trigger event is an operating system hang-up.

**45.** The system of claim **41,** wherein the control information further indicates the nature and occurrence of a second trigger event and a third trigger event, and the controller transfers the digital information between the volatile memory and the nonvolatile memory in response to the control information indicating that any of the trigger events has occurred.

**46.** The system of claim **45,** wherein the trigger event is a power failure, the second trigger event is a system reset and the third trigger event is an operating system hang-up.

**47.** The system of claim **41,** wherein the system includes isolation devices, and the controller instructs the isolation devices to electrically isolate the system from the information source in response to the control information indicating that the trigger event has occurred.

**48.** The system of claim **41,** wherein the system is adapted to be directly connected to a system memory bus that is directly connected to a central processing unit.

**49.** The system of claim **41,** wherein the control register is within the volatile memory and outside a memory map of the volatile memory.

**50.** The system of claim **41,** wherein the controller transfers the digital information between the volatile memory and the nonvolatile memory when the trigger event is unexpected by an operating system, and the controller alters the control information to indicate the absence of the trigger event in response to the operating system indicating that the trigger event is expected.

**51.** A memory backup system, comprising:

a volatile memory for receiving and storing digital information from an information source;

a nonvolatile memory for receiving and storing the digital information communicated from the volatile memory; and

a controller for (1) examining a data structure in the volatile memory to determine whether a trigger event is expected or unexpected by an operating system, (2) transferring the digital information between the volatile memory and the nonvolatile memory if the trigger event is unexpected by the operating system, and (3) not transferring the digital information between the volatile memory and the nonvolatile memory if the trigger event is expected by the operating system.

**52.** The system of claim **51,** wherein the controller includes a volatile memory controller coupled to the volatile memory and a nonvolatile memory controller coupled to the nonvolatile memory.

**53.** The system of claim **52,** wherein the controller includes an address counter coupled to the volatile memory controller and the nonvolatile memory controller.

US 6,336,174 B1

17

**54.** The system of claim **53**, wherein the controller includes a microsequencer coupled to the volatile memory controller, the nonvolatile memory controller and the address counter.

**55.** The system of claim **51**, wherein the controller includes a voltage monitor that indicates a system power supply failure when a system power supply falls below a reference voltage level, a timer that indicates the operating system is hung when the operating system fails to reset the timer, and a system reset line that indicates when a system reset is activated.

**56.** The system of claim **55** wherein the controller includes an OR gate with separate inputs coupled to outputs of the voltage monitor, the timer and the system reset line.

**57.** The system of claim **56**, wherein the controller includes a normal shutdown sequencer that indicates a normal system shutdown.

**58.** The system of claim **57**, wherein the controller includes an AND gate with separate inputs coupled to outputs of the OR gate and the normal shutdown sequencer.

**59.** The system of claim **51**, wherein the data structure also indicates the nature of the trigger event.

**60.** The system of claim **51**, wherein the system is adapted to be directly connected to a system memory bus that is directly connected to a central processing unit.

**61.** A memory backup system, comprising:

a volatile memory for receiving and storing digital information from an information source;

a nonvolatile memory for receiving and storing the digital information communicated from the volatile memory;

a control register for storing control information that indicates the occurrence of first and second trigger events; and

a controller for transferring the digital information between the volatile memory and the nonvolatile memory in response to the control information indicating that any of the trigger events has occurred.

**62.** The system of claim **61**, wherein the trigger events are selected from the group consisting of a power failure, a system reset and an operating system hang-up.

**63.** The system of claim **61**, wherein the first trigger event is a power failure, and the second trigger event is selected from the group consisting of a system reset and an operating system hang-up.

**64.** The system of claim **61**, wherein the first trigger event is a system reset.

**65.** The system of claim **61**, wherein the first trigger event is an operating system hang-up.

**66.** The system of claim **61**, wherein the control information further indicates the nature of the trigger events.

**67.** The system of claim **61**, wherein the system includes isolation devices, and the controller instructs the isolation devices to electrically isolate the system from the information source in response to the control information indicating that any of the trigger events has occurred.

**68.** The system of claim **61**, wherein the system is adapted to be directly connected to a system memory bus that is directly connected to a central processing unit.

18

**69.** The system of claim **61**, wherein the control register is within a reserved portion of the volatile memory and outside a memory map of the volatile memory.

**70.** The system of claim **61**, wherein the controller transfers the digital information between the volatile memory and the nonvolatile memory when the first trigger event has occurred and is unexpected by an operating system, and the controller alters the control information to indicate the absence of the first trigger event in response to the operating system indicating that the first trigger event is expected.

**71.** A memory backup system, comprising:

a volatile memory for receiving and storing digital information from an information source;

a nonvolatile memory for receiving and storing the digital information communicated from the volatile memory;

a control register for storing control information that indicates the occurrence of first and second trigger events, wherein the control register is within the volatile memory; and

a controller for transferring the digital information between the volatile memory and the nonvolatile memory in response to the control information indicating that any of the trigger events has occurred.

**72.** The system of claim **71**, wherein the trigger events are selected from the group consisting of a power failure, a system reset and an operating system hang-up.

**73.** The system of claim **71**, wherein the first trigger event is a power failure, and the second trigger event is selected from the group consisting of a system reset and an operating system hang-up.

**74.** The system of claim **71**, wherein the first trigger event is a system reset.

**75.** The system of claim **71**, wherein the first trigger event is an operating system hang-up.

**76.** The system of claim **71**, wherein the control information further indicates the nature of the trigger events.

**77.** The system of claim **71**, wherein the system includes isolation devices, and the controller instructs the isolation devices to electrically isolate the system from the information source in response to the control information indicating that any of the trigger events has occurred.

**78.** The system of claim **71**, wherein the system is adapted to be directly connected to a system memory bus that is directly connected to a central processing unit.

**79.** The system of claim **71**, wherein the control register is within a reserved portion of the volatile memory and outside a memory map of the volatile memory.

**80.** The system of claim **71**, wherein the controller transfers the digital information between the volatile memory and the nonvolatile memory when the first trigger event has occurred and is unexpected by an operating system, and the controller alters the control information to indicate the absence of the first trigger event in response to the operating system indicating that the first trigger event is expected.

*  *  *  *  *



US007042664B2

(12) **United States Patent**
Gill et al.

(10) Patent No.: **US 7,042,664 B2**
(45) Date of Patent: **May 9, 2006**

(54) **METHOD AND SYSTEM FOR HOST PROGRAMMABLE DATA STORAGE DEVICE SELF-TESTING**

(75) Inventors: **Bradley J. Gill**, Longmont, CO (US); **Kenneth J. Ordes**, Longmont, CO (US)

(73) Assignee: **Seagate Technology LLC**, Scotts Valley, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 149 days.

(21) Appl. No.: **10/764,943**

(22) Filed: **Jan. 26, 2004**

(65) **Prior Publication Data**
US 2005/0162767 A1    Jul. 28, 2005

(51) Int. Cl.
*G11B 27/36*    (2006.01)
(52) **U.S. Cl.** ...................... **360/31**; 360/69; 360/77.02; 360/53
(58) **Field of Classification Search** .................. 360/31, 360/69
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,979,055 A | | 12/1990 | Squires |
| 6,084,733 A | * | 7/2000 | Ohzeki et al. ................ 360/53 |
| 6,600,614 B1 | * | 7/2003 | Lenny et al. ................ 360/31 |
| 6,650,492 B1 | * | 11/2003 | Lenny et al. ................ 360/31 |
| 6,895,500 B1 | * | 5/2005 | Rothberg ...................... 360/31 |

* cited by examiner

*Primary Examiner*—David Hudspeth
*Assistant Examiner*—Natalia Figueroa
(74) *Attorney, Agent, or Firm*—Westman, Champlin & Kelly

(57) **ABSTRACT**

A method and system for providing programmable self-testing of a data storage device comprises selecting one or more host programmable tests stored in memory in the data storage device by setting data in a first log in memory of the data storage device. Parameters for execution of the one or more host programmable tests are set by setting one or more values in a second log in memory of the data storage device. The one or more host programmable tests on the data storage device are then executed. Results of the one or more host programmable tests are stored in a third log in memory of the data storage device.

**20 Claims, 10 Drawing Sheets**





FIG. 1



FIG. 2



**FIG. 3**



**FIG. 4**



**FIG. 5**



**FIG. 6**



**FIG. 7**



**FIG. 8**



**FIG. 9**



**FIG. 10**

US 7,042,664 B2

1

## METHOD AND SYSTEM FOR HOST PROGRAMMABLE DATA STORAGE DEVICE SELF-TESTING

### FIELD OF THE INVENTION

This application relates generally to data storage devices and more particularly to host programmable self-testing of a data storage device.

### BACKGROUND OF THE INVENTION

A data storage device such as a magnetic, optical, or magneto-optical drive includes a rotating storage medium. For example, modem disc drives comprise one or more rigid discs that are coated with a magnetizable medium and mounted on the hub of a spindle motor for rotation at a constant high speed. Information is stored on the discs in a plurality of concentric circular tracks typically by an array of transducers ("heads") mounted to a radial actuator for movement of the heads relative to the discs. Each of the concentric tracks is generally divided into a plurality of separately addressable data sectors.

The read/write transducer, e.g. a magnetoresistive read/write head, is used to transfer data between a desired track and an external environment. The heads are mounted via flexures at the ends of a plurality of actuator arms that project radially outward from the actuator body. The actuator body pivots about a shaft mounted to the disc drive housing at a position closely adjacent the outer extreme of the discs. The pivot shaft is parallel with the axis of rotation of the spindle motor and the discs, so that the heads move in a plane parallel with the surfaces of the discs.

The actuator arm is driven by a control signal fed to the voice coil motor (VCM) at the rear end of the actuator arm. A servo system is used to sense the position of the actuator and control the movement of the head above the disc using servo signals read from a disc surface in the disc drive. The servo system relies on servo information stored on the disc. The signals from this information generally indicate the present position of the head with respect to the disc, i.e., the current track position. The servo system uses the sensed information to maintain head position or determine how to optimally move the head to a new position centered above a desired track. The servo system then delivers a control signal to the VCM to rotate the actuator to position the head over a desired new track or maintain the position over the desired current track.

With time, as these components age and wear, problems may develop in the operation of the data storage device. However, field failure analysis of these problems is sometimes difficult. While various types of test can provide accurate analysis of the problems, they typically require the device to be removed from the host for testing. Removal of the device from the host for testing can result in additional problems. For example, removing the device from the host can cause new problems or failures. Additionally, using a different interface for failure analysis may mask some problems and cause other new problems. Finally, some problems may be host specific and testable only while the device is connected to the host.

Accordingly there is a need for a programmable self-test of the data storage device while the device is still connected to the host. The present invention provides a solution to this and other problems, and offers other advantages over the prior art.

2

### SUMMARY OF THE INVENTION

Against this backdrop the present invention has been developed. According to one aspect of the present invention, a method of executing one or more self-tests on a data storage device comprises selecting one or more host programmable tests stored in memory in the data storage device by setting data in a first log in memory of the data storage device. Parameters for execution of the one or more host programmable tests are set in one or more values in a second log in memory of the data storage device. The one or more host programmable tests on the data storage device are then executed. Results of the one or more host programmable tests are stored in a third log in memory of the data storage device.

According to another aspect of the present invention, a data storage device comprises one or more read/write heads, a storage medium accessible by the one or more read/write heads, a processor coupled with the read/write heads to access data on the storage medium, and a memory connected with and readable by the processor. The memory has stored therein one or more host programmable tests overwritten onto vendor specific portions of a self-monitoring program that are executable by the data storage device while the data storage device is connected with a host.

These and various other features as well as advantages which characterize the present invention will be apparent from a reading of the following detailed description and a review of the associated drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a plan view illustrating the primary internal components of a disc drive incorporating one of the various embodiments of the present invention.

FIG. 2 is a control block diagram for the disc drive shown in FIG. 1 illustrating the primary functional components.

FIG. 3 is a flowchart illustrating data storage device self-testing according to one embodiment of the present invention.

FIG. 4 is a flowchart illustrating a position error signal test that may be part of the self-test illustrated in FIG. 3.

FIG. 5 is a flowchart illustrating a head error rate test that may be part of the self-test illustrated in FIG. 3.

FIG. 6 is a flowchart illustrating a read verify reserve track data test that may be part of the self-test illustrated in FIG. 3.

FIG. 7 is a flowchart illustrating a clear logs test that may be part of the self-test illustrated in FIG. 3

FIG. 8 is a flowchart illustrating an erase drive test that may be part of the self-test illustrated in FIG. 3.

FIG. 9 is a flowchart illustrating a programmable drive write test that may be part of the self-test illustrated in FIG. 3.

FIG. 10 is a flowchart illustrating executing host programmable tests according to one embodiment of the present invention.

### DETAILED DESCRIPTION

Embodiments of the present invention will be discussed with reference to a magnetic disc drive. One skilled in the art will recognize that the present invention may also be applied to any data storage device, such as an optical disc drive, a magneto-optical disc drive, or other data storage device having multiple heads for accessing data on multiple storage media.

US 7,042,664 B2

3

4

FIG. 1 is a plan view illustrating the primary internal components of a disc drive incorporating one of the various embodiments of the present invention. The disc drive 100 includes a base 102 to which various components of the disc drive 100 are mounted. A top cover 104, shown partially cut away, cooperates with the base 102 to form an internal, sealed environment for the disc drive in a conventional manner. The components include a spindle motor 106 which rotates one or more discs 108 at a constant high speed. Information is written to and read from tracks on the discs 108 through the use of an actuator assembly 110, which rotates during a seek operation about a bearing shaft assembly 112 positioned adjacent the discs 108. The actuator assembly 110 includes a plurality of actuator arms 114 which extend towards the discs 108, with one or more flexures 116 extending from each of the actuator arms 114. Mounted at the distal end of each of the flexures 116 is a head 118 which includes a fluid bearing slider enabling the head 118 to fly in close proximity above the corresponding surface of the associated disc 108.

During a seek operation, the track position of the heads 118 is controlled through the use of a voice coil motor (VCM) 124, which typically includes a coil 126 attached to the actuator assembly 110, as well as one or more permanent magnets 128 which establish a magnetic field in which the coil 126 is immersed. The controlled application of current to the coil 126 causes magnetic interaction between the permanent magnets 128 and the coil 126 so that the coil 126 moves in accordance with the well-known Lorentz relationship. As the coil 126 moves, the actuator assembly 110 pivots about the bearing shaft assembly 112, and the heads 118 are caused to move across the surfaces of the discs 108.

The spindle motor 106 is typically de-energized when the disc drive 100 is not in use for extended periods of time. The heads 118 are moved away from portions of the disk 108 containing data when the drive motor is de-energized. The heads 118 are secured over portions of the disk not containing data through the use of an actuator latch arrangement and/or ramp, which prevents inadvertent rotation of the actuator assembly 110 when the drive discs 108 are not spinning.

A flex assembly 130 provides the requisite electrical connection paths for the actuator assembly 110 while allowing pivotal movement of the actuator assembly 110 during operation. The flex assembly includes a printed circuit board 134 to which a flex cable leading to the head is connected; the flex cable leading to the heads 118 being routed along the actuator arms 114 and the flexures 116 to the heads 118. The printed circuit board 132 typically includes circuitry for controlling the write currents applied to the heads 118 during a write operation and a preamplifier for amplifying read signals generated by the heads 118 during a read operation. The flex assembly terminates at a flex bracket 134 for communication through the base deck 102 to a disc drive printed circuit board (not shown) mounted to the bottom side of the disc drive 100.

FIG. 2 is a control block diagram for a disc drive illustrating the primary functional components of a disc drive incorporating one of the various embodiments of the present invention and generally showing the main functional circuits which are resident on the disc drive printed circuit board and used to control the operation of the disc drive 100. The disc drive 100 is operably connected to a host computer 140 in a conventional manner. Control communication paths are provided between the host computer 140 and a disc drive microprocessor 142, the microprocessor 142 generally providing top level communication and control for the disc

drive 100 in conjunction with programming for the microprocessor 142 stored in microprocessor memory (MEM) 143. The MEM 143 can include random access memory (RAM), read only memory (ROM) and other sources of resident memory for the microprocessor 142.

The discs 108 are rotated at a constant high speed by a spindle motor control circuit 148, which typically electrically commutates the spindle motor 106 (FIG. 1) through the use, typically, of back electromotive force (BEMF) sensing. During a seek operation, wherein the actuator 110 moves the heads 118 between tracks, the position of the heads 118 is controlled through the application of current to the coil 126 of the voice coil motor 124. A servo control circuit 150 provides such control. During a seek operation the microprocessor 142 receives information regarding the velocity of the head 118, and uses that information in conjunction with a velocity profile stored in memory 143 to communicate with the servo control circuit 150, which will apply a controlled amount of current to the voice coil motor coil 126, thereby causing the actuator assembly 110 to be pivoted.

Data is transferred between a host computer 140 or other device and the disc drive 100 by way of an interface 144, which typically includes a buffer to facilitate high speed data transfer between the host computer 140 or other device and the disc drive 100. Data to be written to the disc drive 100 is thus passed from the host computer 140 to the interface 144 and then to a read/write channel 146, which encodes and serializes the data and provides the requisite write current signals to the heads 118. To retrieve data that has been previously stored in the data storage device 100, read signals are generated by the heads 118 and provided to the read/write channel 146, which performs decoding and error detection and correction operations and outputs the retrieved data to the interface 144 for subsequent transfer to the host computer 140 or other device.

Stored in memory 143 may be a self-monitoring program such as the Self-Monitoring, Analysis, and Reporting Technology (SMART) feature set. This, and similar programs, monitor a variety of parameters of the data storage device during normal operation. These programs contain a number of vendor specific extensions or tests that are not typically used after manufacture of the device. Additionally, these self-monitoring programs utilize a number of easily accessible memory locations or logs that may be used to store information. Generally, embodiments of the present invention utilize the vendor specific portions of these self-monitoring programs and logs to provide host programmable self-test.

FIG. 3 is a flowchart illustrating data storage device self-testing according to one embodiment of the present invention. Here, processing begins with determination operation 305. Determination operation 305 comprises selecting and programming boundary parameters of one or more host programmable tests provided with the data storage device. That is, the supplier of the data storage device determines which host programmable tests will be made available on the device to be executable by the data storage device while the data storage device is connected with a host. When executed, the user, via the host with which the data storage device is connected, can select one or more of the test to be executed as well as setting parameters for the execution of those tests. In one example, the type of test to be performed may be indicated by the user setting data in a log in the memory of the data storage device. Additionally, setting parameters for execution of the one or more host

US 7,042,664 B2

5

programmable tests may be done by the user setting one or more values in a second log in memory of the data storage device.

Examples of these tests will be discussed below with reference to FIGS. 4–9. Host programmable tests that may be available include, but are not limited to, a Position Error Signal (PES) test, a head error rate test, a read verify reserve track data test, and others as will be discussed below. Control then passes to query operation 315.

Query operation 315 comprises determining the mode of operation the selected tests shall be executed in. In some devices, tests may be executed in two modes of operation, such as of f line and captive. If at query operation 315 a determination is made that the test mode is captive mode, control passes to execute operation 320.

Execute operation 320 comprises executing the selected tests in a captive mode. In captive mode, tests are executed while host-initiated commands are ignored until the data storage device has completed all selected tests. Control then passes to log operation 330.

If, at query operation 315, a determination is made that the test mode is not captive mode, control passes to execute operation 325. Execute operation 325 comprises executing the selected tests in an offline mode. In offline mode tests can be executed and data collected when the data storage device is not servicing host-initiated commands. Control then passes to log operation 330.

Log operation 330 comprises writing the data collected during execution of the selected tests to the appropriate vendor specific logs. For example, the self-monitoring program stored in memory in the data storage device may be the Self-Monitoring, Analysis, and Reporting Technology (SMART) program or another similar program. SMART provides a number of vendor specific tests that are not used after manufacture of the device as well as a number of logs stored in the memory of the device. The host programmable tests may be overwritten on these vendor specific tests, at step 310. Additionally, as will be seen below, the logs may be used to store control information and results for the host programmable tests.

FIG. 4 is a flowchart illustrating a Position Error Signal (PES) test that may be part of the self-test illustrated in FIG. 3. In this example, processing begins with select operation 405. Select operation 405 comprises selecting a read/write head of the data storage device and a track of a storage medium in the data storage device to be tested where the selected track is accessible by the selected read/write head. Control then passes to receive operation 410.

Receive operation 410 comprises receiving a host request for servo data from the selected track. That is, through the host, a tester may request one or more servo sectors of the storage medium to be read and tested. Control the passes to read operation 415.

Read operation 415 comprises collecting PES data from the selected track while reading the requested servo data. In some cases, the PES data may be calculated as a percentage off-track value for the head and track being tested. Control then passes to store operation 420.

Store operation 420 comprises storing the collected PES data in a log in memory of the data storage device. That is, the collected PES data may be stored in a log such as the SMART logs where it can be accessed via the host or another means.

FIG. 5 is a flowchart illustrating a head error rate test that may be part of the self-test illustrated in FIG. 3. Processing begins with select operation 505. Select operation 505 comprises selecting a range of addresses to be tested on a

6

storage medium in the data storage device. For example, a starting and ending address, such as a Logical Block Address (LBA), may be specified. In some cases, these addresses may be set by the tester in logs, such as SMART logs, in the memory of the data storage device. Control then passes to read operation 510.

Read operation 510 comprises collecting head error rate data for the range of addresses selected. That is, as data is read from the storage medium between the starting and ending addresses, error rate information is collected. Control then passes to store operation 515.

Store operation 515 comprises storing the head error rate data and a test complete status in a log in memory of the data storage device. That is, the collected error rate data may be stored in a log such as the SMART logs where it can be accessed via the host or another means.

FIG. 6 is a flowchart illustrating a read verify reserve track data test that may be part of the self-test illustrated in FIG. 3. Here, processing begins with read operation 605. Read operation 605 comprises performing a sector-by-sector read of reserve track data on a storage medium of the data storage device. Control then passes to query operation 610.

Query operation 610 comprises determining whether an uncorrectable error has been detected during the sector-by-sector read of the reserve track data on the storage medium. If a determination is made that no uncorrectable errors have been detected, control passes to store operation 615. If, however, a determination is made that one or more uncorrectable errors have been detected, control passes to store operation 620. Store operation 620 comprises storing a number of errors and an offset value for each error. That is, the collected error data may be stored in a log such as the SMART logs where it can be accessed via the host or another means. Control passes to store operation 615.

Store operation comprises storing a test complete signal in a log in memory of the data storage device. That is, the test complete signal may be stored in a log such as the SMART logs where it can be accessed via the host or another means.

FIG. 7 is a flowchart illustrating a clear logs test that may be part of the self-test illustrated in FIG. 3. In this example, processing begins with query operation 705. Query operation 705 comprises determining whether a test key stored in a first log of a plurality of logs in memory of the data storage device has been set. That is, since this function is destructive of information in the logs, a key is used to verify the intention to perform this function. The key may be in the form of a flag or other information such as a password stored in the logs by the tester. If, at query operation 705, a determination is made that the test key has not been set, no further processing is performed. If, however, a determination is made that the test key has been properly set, control passes to set operation 710.

Set operation 710 comprises clearing all logs of the plurality of logs in memory of the data storage device. That is, all logs in the data storage device memory, such as SMART logs, are cleared. Control then passes to erase operation 715.

Erase operation 715 comprises erasing the test key. Once again, since the clear logs function is destructive, the key will be erased after use to prevent accidental re-execution of the function.

FIG. 8 is a flowchart illustrating an erase drive test that may be part of the self-test illustrated in FIG. 3. Processing begins with query operation 805. Query operation 805 comprises determining whether a test key stored in a first log in memory of the data storage device has been set. That is, since this function is destructive of information on the

US 7,042,664 B2

7

storage medium, a key is used to verify the intention to perform this function. The key may be in the form of a flag or other information such as a password stored in the logs by the tester. If, at query operation **805**, a determination is made that the test key has not been set, no further processing is performed. If, however, a determination is made that the test key has been properly set, control passes to query operation **810**.

Query operation **810** comprises determining whether an erase start address and an erase end address stored in a second log in memory of the data storage device are within a range of addresses available on the data storage device. That is, an erase start address and an erase end address, perhaps in the form of an LBA, may be stored in the logs in the memory of the data storage device. These addresses are checked to determine whether they are valid addresses for the data storage device. If the erase start address and the erase end address stored in the second log in memory of the data storage device are not within a range of addresses available on the data storage device, no further processing is performed. However, if the start and end addresses are within the range of available addresses, control passes to erase operation **815**.

Erase operation **815** comprises erasing the storage medium of the data storage device in the range specified by the erase start and erase end addresses. Control then passes to erase operation **820**.

Erase operation **820** comprises erasing the test key. Once again, since the erase function is destructive, the key will be erased after use to prevent accidental re-execution of the function.

FIG. **9** is a flowchart illustrating a programmable rewrite test that may be part of the test illustrated in FIG. 3. Here, processing begins with query operation **905**. Query operation **905** comprises determining whether a test key stored in a first log in memory of the data storage device has been set. That is, since this function is destructive of information on the storage medium, a key is used to verify the intention to perform this function. The key may be in the form of a flag or other information such as a password stored in the logs by the tester. If, at query operation **905**, a determination is made that the test key has not been set, no further processing is performed. If, however, a determination is made that the test key has been properly set, control passes to query operation **910**.

Query operation **910** comprises determining whether a rewrite start address and a rewrite end address stored in a second log in memory of the data storage device are within a range of addresses available on the data storage device. That is, a rewrite start address and a rewrite end address, perhaps in the form of an LBA, may be stored in the logs in the memory of the data storage device. These addresses are checked to determine whether they are valid addresses for the data storage device. If the rewrite start address and the erase end address stored in a log in memory of the data storage device are not within a range of addresses available on the data storage device, no further processing is performed. However, if the start and end addresses are within the range of available addresses, control passes to rewrite operation **915**.

Rewrite operation **915** comprises rewriting data on a storage medium of the data storage device with a value stored in a third log in memory of the data storage device in the range specified by the rewrite start and rewrite end addresses. That is, the tester may set a rewrite pattern in the logs in memory of the data storage device. This pattern will

8

then be rewritten to all data located between the starting and ending addresses. Control then passes to erase operation **920**.

Erase operation **920** comprises erasing the test key. Once again, since the rewrite function is destructive, the key will be erased after use to prevent accidental re-execution of the function.

FIG. **10** is a flowchart illustrating executing host programmable tests according to one embodiment of the present invention. Here, processing begins with select operation **1005**. Select operation **1005** comprises selecting one or more host programmable tests stored in memory in the data storage device by setting data in a first log in memory of the data storage device. That is, the tester may select one or more of the host programmable tests but setting a flag or other data in a specific log in the memory. Control then passes to set operation **1010**.

Set operation **1010** comprises setting parameters for execution of the one or more host programmable tests by setting one or more values in a second log in memory of the data storage device. In other words, the tester sets parameters such as a test key, starting address, ending address, and other parameters discussed above in the logs. Control then passes to execute operation **1015**.

Execute operation **1015** comprises executing the one or more host programmable tests on the data storage device. Control then passes to read operation **1020**.

Read operation **1020** comprises retrieving results of the one or more host programmable tests from a third log in memory of the data storage device. That is, the tester, through the host or by another means, reads the test results saved in the logs as indicated above.

It will be clear that the present invention is well adapted to attain the ends and advantages mentioned as well as those inherent therein. While a presently preferred embodiment has been described for purposes of this disclosure, various changes and modifications may be made which are well within the scope of the present invention. For example, a self-monitoring program other than SMART may be used to provide host programmable tests. Additionally, more, fewer, or different tests than those discussed herein may be made available as host programmable tests. Numerous other changes may be made which will readily suggest themselves to those skilled in the art and which are encompassed in the spirit of the invention disclosed and as defined in the appended claims.

What is claimed is:

1. A method of executing one or more self-tests on a data storage device comprising:

    selecting one or more host programmable tests stored in memory in the data storage device by setting data in a first log in memory of the data storage device, wherein the one or more host programmable tests comprises at least one test of the group consisting of a Position Error Signal (PES) test, a head error rate test, a read verify reserve data track test, a clear logs test, an erase drive test, and a rewrite test;

    setting parameters for execution of the one or more host programmable tests by setting one or more values in a second log in memory of the data storage device;

    executing the one or more host programmable tests on the data storage device; and

    storing results of the one or more host programmable tests in a third log in memory of the data storage device.

2. The method of claim 1, wherein one test of the one or more host programmable tests is the Position Error Signal (PES) test comprising:

US 7,042,664 B2

9

selecting a read/write head of the data storage device and a track of a storage medium in the data storage device to be tested, the selected track accessible by the selected read/write head;

receiving a host request for servo data from the selected track;

collecting PES data from the selected track while reading the requested servo data; and

storing the collected PES data in a log in memory of the data storage device.

3. The method of claim 1, wherein one test of the one or more host programmable tests is the head error rate test comprising:

selecting a range of addresses to be tested on a storage medium in the data storage device;

collecting head error rate data for the range of addresses selected; and

storing the head error rate data and a test complete status in a log in memory of the data storage device.

4. The method of claim 1, wherein one test of the one or more host programmable tests is the read verify reserve data track test comprising:

performing a sector-by-sector read of reserve track data on a storage medium of the data storage device;

determining whether an uncorrectable error has been detected during the sector-by-sector read of the reserve track data on the storage medium;

responsive to determining one or more uncorrectable errors have been detected, storing a number of errors and an offset value for each error in a log in memory of the data storage device; and

storing a test complete signal in the log in memory of the data storage device.

5. The method of claim 1, wherein one test of the one or more host programmable tests is the clear logs test comprising:

determining whether a test key stored in a first log of a plurality of logs in memory of the data storage device has been set; and

responsive to determining that the test key has been set, clearing all logs in the plurality of logs in memory of the data storage device and erasing the test key.

6. The method of claim 1, wherein one test of the one or more host programmable tests is the erase drive test comprising:

determining whether a test key stored in a first log in memory of the data storage device has been set;

determining whether an erase start address and an erase end address stored in a second log in memory of the data storage device are within a range of addresses available on the data storage device; and

responsive to determining that the test key has been set and the erase start and erase end addresses are within a range of addresses available on the data storage device, erasing a storage medium of the data storage device in the range specified by the erase start and erase end addresses and erasing the test key.

7. The method of claim 1, wherein one test of the one or more host programmable tests is the rewrite test comprising:

determining whether a test key stored in a first log in memory of the data storage device has been set;

determining whether a rewrite start address and a rewrite end address stored in a second log in memory of the data storage device are within a range of addresses available on the data storage device; and

responsive to determining that the test key has been set and the rewrite start and rewrite end addresses are

10

within a range of addresses available on the data storage device, rewriting data on a storage medium of the data storage device with a value stored in a third log in memory of the data storage device in the range specified by the rewrite start and rewrite end addresses and erasing the test key.

8. The method of claim 1, wherein executing the one or more host programmable tests on the data storage device comprises executing the one or more host programmable tests in a captive mode.

9. The method of claim 1, wherein executing the one or more host programmable tests on the data storage device comprises executing the one or more host programmable tests in an offline mode.

10. A data storage device comprising:

a storage medium;

a processor coupled to access data on the storage medium; and

a memory connected with and readable by the processor and having stored therein one or more host programmable tests overwritten onto vendor specific portions of a self-monitoring program and executable by the data storage device while the data storage device is connected with a host.

11. The data storage device of claim 10, wherein the self-monitoring program is the Self-Monitoring, Analysis, and Reporting Technology (SMART) program.

12. The data storage device of claim 10 and further comprising one or more read/write heads, which access the storage medium, wherein one test of the one or more host programmable tests is a Position Error Signal (PES) test comprising:

selecting a read/write head of the data storage device and a track of the storage medium to be tested, the selected track accessible by the selected read/write head;

receiving a host request for servo data from the selected track;

collecting PES data from the selected track while reading the requested servo data; and

storing the collected PES data in a log in the memory.

13. The data storage device of claim 10 and further comprising one or more read/write heads, which access the storage medium, wherein one test of the one or more host programmable tests is a head error rate test comprising:

selecting a range of addresses to be tested on the storage medium;

collecting head error rate data for the range of addresses selected; and

storing the head error rate data and a test complete status in a log in the memory.

14. The data storage device of claim 10, wherein one test of the one or more host programmable tests is a read verify reserve data track test comprising:

performing a sector-by-sector read of reserve track data on the storage medium;

determining whether an uncorrectable error has been detected during the sector-by-sector read of the reserve track data on the storage medium;

responsive to determining one or more uncorrectable errors have been detected, storing a number of errors and an offset value for each error in a log in the memory; and

storing a test complete signal in the log in the memory.

15. The data storage device of claim 10, wherein one test of the one or more host programmable tests is a clear logs test comprising:

US 7,042,664 B2

| 11 | 12 |

determining whether a test key stored in a first log of a plurality of logs in the memory has been set; and

responsive to determining that the test key has been set, clearing all logs of the plurality of logs in the memory and erasing the test key.

**16.** The data storage device of claim **10**, wherein one test of the one or more host programmable tests is an erase drive test comprising:

determining whether a test key stored in a first log in the memory has been set;

determining whether an erase start address and an erase end address stored in a second log in the memory are within a range of addresses available on the data storage device; and

responsive to determining that the test key has been set and the erase start and erase end addresses are within a range of addresses available on the data storage device, erasing the storage medium in the range specified by the erase start and erase end addresses and erasing the test key.

**17.** The data storage device of claim **10**, wherein one test of the one or more host programmable tests is a rewrite test comprising:

determining whether a test key stored in a first log in the memory has been set;

determining whether a rewrite start address and a rewrite end address stored in a second log in the memory are within a range of addresses available on the data storage device; and

responsive to determining that the test key has been set and the rewrite start and rewrite end addresses are within a range of addresses available on the data storage device, rewriting data on the storage medium with a value stored in a third log in the memory in the range specified by the rewrite start and rewrite end addresses and erasing the test key.

**18.** The data storage device of claim **10**, wherein the one or more host programmable tests are executable in a captive mode.

**19.** The data storage device of claim **10**, wherein the one or more host programmable tests are executable in an offline mode.

**20.** A method of executing one or more self-tests on a data storage device comprising:

selecting one or more host programmable tests stored in memory in the data storage device by setting data in a first log in memory of the data storage device;

setting parameters for execution of the one or more host programmable tests by setting one or more values in a second log in memory of the data storage device;

executing the one or more host programmable tests on the data storage device in a captive mode in which host-initiated commands are ignored; and

storing results of the one or more host programmable tests in a third log in memory of the data storage device.

\*    \*    \*    \*    \*

JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

Seagate Technology LLC, Seagate Technology International, Seagate Singapore International Headquarters Pte. Ltd., and Maxtor Corporation

### DEFENDANTS

STEC, Inc.

HRL

**(b)** County of Residence of First Listed Plaintiff  New Castle, Delaware
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Kurt M. Kjelland
HELLER EHRMAN LLP
4350 La Jolla Village Drive
San Diego, CA 92122-1246; tel. (858) 450-8400

Attorneys (If Known)

E-filing

ADR

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury — Med. Malpractice
- [ ] 365 Personal Injury — Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/Accommodations
- [ ] 444 Welfare
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence
  Habeas Corpus:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt.Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 463 Habeas Corpus - Alien Detainee
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. §§ 271 et seq.
Brief description of cause:
Patent infringement

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ TBD; Injunction

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

- [ ] SAN FRANCISCO/OAKLAND
- [ ] SAN JOSE

Patent Infringement Action, District-wide assignment

DATE
April 14, 2008

SIGNATURE OF ATTORNEY OF RECORD
Kurt M. Kjelland / CSA